[No. B173781. Second Dist., Div. Four. Feb. 24, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTWAINE DEVON BUTLER, Defendant and Appellant.

COUNSEL

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc J. Nolan and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**EPSTEIN, P. J.**—Antwaine Devon Butler appeals from his conviction of first degree murder. He claims a violation of his Sixth Amendment confrontation rights based on the trial court's admission of prior inconsistent statements by two witnesses and evidence of a prior uncharged offense. Appellant also asserts instructional error in the trial court's refusal to give requested instructions on voluntary manslaughter. We find no Sixth Amendment violation and conclude the evidence of the uncharged offense was relevant and admissible. On this record, the trial court was not required to instruct on voluntary manslaughter.

## FACTUAL AND PROCEDURAL SUMMARY

This appeal arises from a murder which occurred on November 21, 2002. The trial court admitted evidence of an incident on November 16, 2002, as relevant to the murder, so we begin our summary with that event.

On the evening of November 16, friends Ronnie, Andre, Tony, Alonso, Clive, Reggie, and Gustavo attended a birthday party in the neighborhood of 42d and Normandie in Los Angeles. Appellant also was at the party, and argued with Reggie. Then, appellant approached Ronnie, claiming that Ronnie was looking at him. Appellant asked if Ronnie knew him, which Ronnie denied. When Ronnie turned to leave, appellant punched him on the lip. Ronnie had never seen appellant before this party.

When his friends saw Ronnie's bleeding lip, they asked what had happened. When they heard appellant had hit Ronnie, some of the group of friends ran outside, saw appellant at the corner of 42d and Normandie, and chased him. Clive was in this group. Appellant got away. Clive was upset that appellant had hit Ronnie. The mothers of two of the boys, Ronnie and Reggie, arrived to drive the group home. Tony, Andre, Clive, and Reggie drove away in the car driven by Reggie's mother. As they were leaving,

Andre and Tony saw appellant coming down the street with a gun in his hand. Appellant pointed it at someone outside the car.

The birthday party was chaperoned by Joe Bigelow and his brother-in-law, Tyrone Jemison. They checked the partygoers for weapons before allowing them to enter the backyard. Bigelow saw appellant approach, then turn and walk away, and then return a few minutes later. Appellant was patted down by Bigelow and was allowed to enter the party because no weapon was found. An hour later, appellant left the party in a hurry, followed by a group of people. There was a commotion. Five or 10 minutes after that, appellant returned with a semiautomatic handgun, walking down the middle of the street. Bigelow yelled, "Don't come down here with a gun." Appellant replied: "Tell them to come out." He kept yelling this demand. Bigelow did not know to whom appellant was referring, but did not let anyone out of the party because appellant was holding a gun. When appellant continued to approach, Bigelow took out a gun and cocked it and Jemison retrieved a shotgun from inside the house. At that, appellant stopped and went away. He appeared "pretty upset like he wanted to shoot somebody." After appellant left, two vehicles arrived and picked up some kids.

At 4:00 p.m. on November 21, 2002, some of the same group was gathered at a bus stop at Western and Vernon Avenues. The group included Clive, Andre, Tony, and Gregory. Gregory saw appellant, accompanied by an African-American male and a Hispanic male, walking by a Shell gas station across the street. Of these three men, appellant was the only one wearing his hair in a ponytail. Appellant and his companions crossed the street to the group at the bus bench. Appellant asked Clive if he remembered him, and when Clive said "No," appellant hit him. Gregory was hit in the face and then Andre told him to run. Gregory fled the scene through an alley. As he ran, he heard multiple gun shots nearby. At trial, Gregory at first denied, but then admitted, he saw the handle of a gun on appellant as appellant walked toward the group at the bus stop.

When appellant hit Clive, a fight started between the two groups. Tony testified that he saw appellant holding Clive in a headlock. Appellant reached into his shirt and Tony saw the handle of a gun. Tony hit appellant and Clive got away at that point. Both Clive and Tony ran, but separated. Seconds later, Tony heard gunshots but did not see the shooter. Andre's shirt had been pulled over his head in the melee, and he heard gunshots but did not see the shooter. After the shots, Clive's friends fled. Andre and Tony returned to the scene and found Clive lying facedown with gunshot wounds. Clive had suffered 10 gunshot wounds. He was 14 years old.

Omar Hines was standing outside a restaurant at the intersection of Western and Vernon when he saw the fight at the bus stop. He saw an

African-American man with a ponytail take a gun out. Everyone started running when the man with the gun started shooting. A teenager fell to the ground and appellant went over to him and fired more shots.

Tonia Poe, a teacher at the Little Citizens Westside Academy, witnessed the shooting. At trial, she denied making statements to colleagues immediately after the shooting identifying appellant as the perpetrator. The trial court admitted the testimony of several of her colleagues as to Poe's inconsistent prior statements identifying appellant as the shooter. Another employee at the school, Tamika Hunter, denied at trial that appellant had told her he would miss a tutoring session scheduled for the day of the shooting since " 'he couldn't stay that day because he had some business to take care of. He had to get his name out of some mess.' " The trial court admitted the testimony of two witnesses confirming the statements Hunter recanted at trial. We reserve the details of this testimony for our discussion of appellant's claim that his constitutional right to confrontation was violated in the admission of the prior inconsistent statements of these two witnesses.

Appellant presented no defense and was convicted of first degree murder. He was sentenced to a term of 50 years to life and filed a timely appeal.

## DISCUSSION

### I

Appellant's first argument is based on the trial court's admission of Poe's prior inconsistent statement that she saw him shoot the victim, and Hunter's statement that appellant said he would miss their tutoring session because he had business to take care of. Because each witness denied making the statement at trial, neither defended or explained the statement attributed to her. Under these circumstances, appellant concludes his right to confrontation guaranteed by the Sixth Amendment of the United States Constitution was violated.[1] We begin with a review of the relevant testimony.

### A. *Tonia Poe*

The prosecution presented testimony from Poe's colleagues at the school, saying that Poe returned from the scene of the shooting, hysterical, and identified her former student, appellant, as the shooter. At the preliminary hearing and at trial, Poe denied making these statements.

---

[1] Respondent contends the appellant waived the confrontation issue because he did not object to the testimony below. Because *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] was decided after the trial in this case, the failure to object was excusable. (*People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411, fn. 2 [18 Cal.Rptr.3d 230].)

Poe testified that she was at the gas station on the corner of Western and Vernon at the time of the shooting. She had left work at the Academy, and was on the way to her second job. She said that when she got to the gas station, she looked and could not find her wallet. Before she could do anything about it, she heard gunshots. She fled in her car and returned to the Academy to get her wallet. The Academy is one block from the crime scene.

At trial, Poe testified that she did not see the shots fired. She said she did not see appellant in the area of the shooting. Poe admitted that she was crying and shaking when she returned to the Academy because she had never been that close to gunshots before. She denied telling either Erin Ramsey, another teacher, or the principal, Angela Moore, that she had seen appellant shoot and kill a kid on the street. She denied seeing appellant in the fight. She also denied telling Ms. Ramsey that "it was not going to go any further than this, meaning that day." Poe denied telling Ms. Ramsey, "I am afraid, I know these people, my boyfriend knows these people, I work around here, I am afraid." She denied telling Ms. Ramsey she did not want to testify. Poe denied telling Ms. Moore she saw appellant in the fight, that he shot the victim, and that she did not want to testify.

Poe admitted she participated in a conference call at the school with Ms. Moore and Deborah Lewis. They discussed the shooting, but Poe testified that all she said was that she heard shots and drove away. Ms. Lewis asked her whether she had seen appellant commit the shooting. She said "No."

Poe denied telling another colleague, Doris Evans, that she saw appellant shoot a boy and that she refused to report this. She did not tell Ms. Evans that Poe's boyfriend, Curtis, told her she should not have talked about the shooting at the school. Poe denied being threatened or being afraid of testifying that she saw appellant shoot the victim, but admitted that she was concerned about her safety as a witness. She said she did not want to be in court.

Erin Ramsey testified that she was on her way out of the Academy the afternoon of the shooting when Poe came into the building, crying, with a look of fear on her face. Ramsey followed Poe back into the school to find out what was wrong. Poe went into the office of Ms. Moore, the principal. Poe did not go upstairs to her classroom. After walking back and forth, the first thing Poe said was that she had seen appellant shoot a boy. Poe repeated this as she cried and rocked back and forth. Alarmed at Poe's condition, Ramsey left her with another colleague, Mr. Mitchell (who had just arrived). Ramsey got Ms. Dunk (also a colleague) and Ms. Moore to come to the office.

Once she calmed down a bit, Poe told the others in the office that she had seen appellant cross the street with two other people and engage in a fight with other boys. She saw appellant take out a gun and start shooting. Poe became more hysterical once Mr. Mitchell went to the crime scene and returned to report that the shooting victim was dead. Poe said she did not want to testify because she was familiar with appellant and his family. They knew where she worked. Poe never said anything about having misplaced her wallet.

### B. *Tamika Hunter*

At trial, Hunter testified that she had been doing one-on-one tutoring sessions with appellant between 2:45 p.m. and 3:30 p.m., Mondays through Thursdays for about a month before the shooting. She saw appellant the morning of November 21, 2002. Hunter testified that appellant told her he would miss his tutoring session that afternoon, but did not say why. She did not ask him why he would miss the session. Appellant had never before missed a tutoring session. He did not appear for tutoring that day.

Deborah Lewis, an administrator at the Academy, is Hunter's mother. Hunter testified that she had never told her mother that appellant had told her he was going to clear his name. She also denied making such a statement to Ms. Moore. Hunter admitted telling others at the school that she did not want to be involved in the case because she was concerned for her safety and the safety of others. She denied being threatened by appellant or anyone else about her testimony. Defense counsel cross-examined Hunter at length about her mother's testimony that Hunter had previously said appellant missed the appointment because of business he had to take care of.

### C. *Other witnesses*

Ms. Lewis works on a campus of the Academy different from the one at which Poe and her colleagues worked. After the shooting, the same afternoon, Lewis received a conference call on speaker phone from Ms. Moore. Several other staff were present on Ms. Moore's end, including Poe. Doris Evans, the overall director of the school, also participated from a separate location. Lewis knew every participant and recognized their voices on the call. Poe was extremely upset, crying, and talking fast. Poe told everyone on the call that she had seen appellant shoot someone.

Hunter was in the office with Lewis when the call came through and they were on hold. Hunter told her that appellant had cancelled his tutoring session that day because he had some business to take care of, and had to get his name out of some mess. When the conference call resumed, Hunter told the

others about what appellant had said. Later, Hunter told Lewis she would not testify because she was afraid.

After the conference call, Lewis telephoned 911 to report the murder. She made the call between 6:00 p.m. and 6:30 p.m. on the afternoon of the shooting. She reported the murder because Poe said she would not. Because the operator seemed nonchalant about the report, Lewis said she had witnessed the murder. She described what Poe had told her, including identifying appellant as the shooter. Late on the night of the shooting, Lewis, accompanied by Ms. Evans from the school, went to the police station to report she had information about the shooting. They did not identify Poe as the source of their information at that time, but did identify Poe and tell officers what she said at a later time.

Ms. Moore testified and confirmed Poe's statements which we have summarized. Moore heard Poe say three times that she had seen appellant cross the street, get into a fight, and shoot a boy. Moore also confirmed that while on the conference call, she heard Hunter say that appellant left school early because he had to clear his name in some mess. According to Moore, Poe left and went to her second job while the conference call was in progress. Later, Poe called the school and was conferenced back into the call. She told everyone she had just spoken with her boyfriend, who had told her she should not have told everyone what she had seen. Poe said she would not testify. During this part of the conference call, Ms. Evans asked Poe what she could do to help her. Poe said, "the only thing you can do to help me is to lie." At that point Poe again said she could not believe appellant had shot the victim.

Ms. Evans also testified that Poe had identified appellant as the shooter during the conference call and that Poe said she would not testify. Poe said her boyfriend had told her to keep her mouth shut.

Appellant relies on *Crawford v. Washington, supra*, 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], to argue that the admission of prior inconsistent statements by Poe and Hunter violated his right to confrontation under the Sixth Amendment. "Prior to *Crawford*, the admission of a hearsay statement under a firmly rooted exception to the hearsay rule or when there were indicia of reliability did not violate a defendant's right of confrontation. (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531.)" (*People v. Corella* (2004) 122 Cal.App.4th 461, 467 [18 Cal.Rptr.3d 770].)

█ In *Crawford*, the Supreme Court announced a new test to determine whether the admission of a testimonial statement by a witness is a violation of the confrontation clause. The court did not define "testimonial," but observed that the confrontation clause is focused on testimonial statements.

" 'Testimony,' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement." (*Crawford v. Washington, supra,* 541 U.S. at p. 51 [158 L.Ed.2d at p. 193, 124 S.Ct. at p. 1364].)

■ The *Crawford* court went on to examine the various formulations of "testimonial," which include affidavits, custodial examinations, and prior testimony. (*Crawford v. Washington, supra,* 541 U.S. at p. 51 [158 L.Ed.2d at p. 193, 124 S.Ct. at p. 1364].) The Supreme Court held that *testimonial* out-of-court statements are not admissible unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (*Id.* at p. 68 [158 L.Ed.2d at p. 204, 124 S.Ct. at p. 1374].) It left a comprehensive definition of "testimonial" for another day, but observed that it applies at minimum to prior testimony at a preliminary hearing, before a grand jury, and to police interrogations. (*Ibid.*)

■ As to nontestimonial hearsay, the *Crawford* court observed: "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531]], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." (*Crawford v. Washington, supra,* 541 U.S. at p. 68 [158 L.Ed.2d at p. 203, 124 S.Ct. at p. 1374].)

■ In *People v. Corella, supra,* 122 Cal.App.4th 461, the Court of Appeal concluded that, after *Crawford,* "a 'nontestimonial' hearsay statement continues to be governed by the *Roberts* standard, but the admission of a 'testimonial' hearsay statement constitutes a violation of a defendant's right of confrontation unless the declarant is unavailable to testify at trial and the defense had a prior opportunity for cross-examination. (*Crawford,* 124 S.Ct. at pp. 1369, 1374.)" (*Id.* at p. 467.) In *Corella,* the defendant's wife telephoned 911 and said appellant had punched her. She repeated these facts to an officer who responded to the scene, and to a paramedic. At the preliminary hearing, Mrs. Corella recanted her statements. She did not testify at trial. The police officer testified to the statements at trial and a tape recording of the 911 telephone call was played for the jury.

Corella argued that the statements to the 911 operator and the police officer were inadmissible because they were testimonial within the meaning of *Crawford.* The court agreed that the statements were properly admitted

because they were not testimonial. (*People v. Corella, supra,* 122 Cal.App.4th at p. 467.) It concluded that the statements were not akin to interrogation because they were not " 'knowingly given in response to structured police questioning,' and bear no indicia common to the official and formal quality of the various statements deemed testimonial by *Crawford*." (*Id.* at p. 468.)

As in *Corella*, the statements made by Poe and Hunter on the afternoon of the shooting "bear no indicia" common to the various testimonial settings identified by the *Crawford* court. No government official was present. The statements were made spontaneously to coworkers. Appellant asserts that the statements by Poe and Hunter were testimonial "because an objective observer would reasonably foresee that [the] statement could be used in a prosecution." He also argues that the statements were testimonial because they were included in police reports of statements made by other witnesses. We find no language in *Crawford* that supports these arguments. Rather, appellant's position is contrary to the language we have quoted from *Crawford* in which the Supreme Court focused on statements given in lieu of oral testimony, such as an affidavit, or given to a government official in a formal statement.

█ Even if the statements were considered testimonial, both Poe and Hunter were available for cross-examination at trial. Appellant contends he had no meaningful opportunity for cross-examination because each denied the prior inconsistent statements attributed to her. Each witness was thoroughly examined and denied making the statements. In addition, each prosecution witness who testified about the prior statements was thoroughly cross-examined about the circumstances in which the statements were made. It was pointed out in examination that either Poe and Hunter were lying, or their colleagues from the school were lying. We find no violation of the Sixth Amendment under these circumstances. Therefore, the California hearsay law applies. Appellant does not argue that the statements were inadmissible under California's rule on prior inconsistent statements, Evidence Code sections 770 and 1235. At oral argument, respondent referred to the spontaneous statement exception to the hearsay rule. (Evid. Code, § 1240.) Since this was not raised in the trial court, we do not base our decision on this ground.

II

Appellant also argues the trial court erred in admitting evidence of the incident at the November 16 party. He cites Evidence Code section 1101

which prohibits the admission of uncharged acts to show a criminal disposition or propensity to commit the crime charged.[2]

The prosecutor argued that the evidence of the November 16 incident was relevant to prove motive. The defense objected on the grounds that the events at the party were unrelated to the murder because different people were involved in a different scenario at a different location. The defense argued that the evidence should be excluded because the prejudice outweighed the probative value. We reject respondent's argument that the issue was not preserved for appeal.

■ "Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. (*People* v. *Durham* (1969) 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198]; Evid. Code, § 1101, subd. (b).) The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. (*People* v. *DeRango* (1981) 115 Cal.App.3d 583, 589 [171 Cal.Rptr. 429], citing *People* v. *Matson* (1974) 13 Cal.3d 35, 40 [117 Cal.Rptr. 664, 528 P.2d 752].) When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].) Because this type of evidence can be so damaging, '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' (*Id.* at p. 316.)" (*People v. Daniels* (1991) 52 Cal.3d 815, 856 [277 Cal.Rptr. 122, 802 P.2d 906].) ■ "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

■ The Supreme Court has held that "[a]s long as there is a direct relationship between the prior offense and an element of the charged offense, introduction of that evidence is proper. [Citations.]" (*People v. Daniels*,

---

[2] Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

*supra,* 52 Cal.3d at p. 857.) Here we find the requisite direct relationship between the November 16 incident and the November 21 shooting. In each, appellant had a dispute with members of the same group of friends. He was chased by the group at the November 16 party, then brandished a weapon at them as they drove away from that party. Clive was in the group that chased appellant. On November 21, three of the friends who had been together at the party were at the bus stop—Tony, Andre, and Clive. Appellant approached the group and asked Clive if he remembered him. When Clive said he did not, appellant hit him without provocation. Various members of the group testified that the first time they had seen appellant was at the November 16 party. The incident at the November 16 party is relevant to explain appellant's motive for the otherwise unprovoked attack on Clive. It was properly admitted as more probative than prejudicial in light of the more serious nature of the November 21 shooting. As in *People v. Daniels, supra,* 52 Cal.3d at page 858, the evidence of the prior incident was crucial to the prosecution's theory of the case.

### III

Finally, appellant argues the trial court erred in refusing his proffered instructions on the lesser included offense of voluntary manslaughter based on heat of passion. The prosecution argued against the instruction based on the evidence that appellant initiated the fight, and that when the shooting occurred, Clive was attempting to run from the scene.

■ " ' "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence . . . ." [Citations.]' (*People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392].) 'To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' (*Ibid.*) Conversely, even on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction. (See *People v. Avena* [(1996)] 13 Cal.4th 394, 414 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." [Citation.]' (*People v. Lewis, supra,* 25 Cal.4th at p. 645.)" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007–1008 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

We conclude the trial court properly rejected the voluntary manslaughter instruction because appellant armed himself with a gun before confronting the group at the bus stop, hit Clive without provocation, and then shot the unarmed Clive when Clive was attempting to run from the fight. This evidence is consistent only with first degree murder.

## DISPOSITION

The judgment is affirmed.

Hastings, J., and Grimes, J.,[*] concurred.

Appellant's petition for review by the Supreme Court was denied June 8, 2005.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.