Filed 8/20/14  P. v. Lacayo CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DERSUS ADOLFO LACAYO,<br><br>Defendant and Appellant. | C069959<br><br>(Super. Ct. No. 11F00098) |

An information charged defendant Dersus Adolfo Lacayo with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] with an added allegation that his victim, Luis "Alex" Arvizu Lopez suffered great bodily injury (GBI) (§ 12022.7).  Both defendant and his friend Elvis Edilson Zelaya were also charged with battery causing serious bodily injury.  (§ 243, subd. (d).)

_____

[1] Further undesignated statutory references are to the Penal Code.

1

Following trial, the jury found defendant guilty on both counts and the GBI allegation and acquitted Zelaya. The trial court sentenced defendant to three years in prison on the assault charge, and three consecutive years on the GBI enhancement. The court also imposed a four year term on count two, stayed pursuant to section 654.

On appeal, defendant contends the trial court improperly permitted the People to introduce evidence he possessed a knife earlier on the night of the crime. We agree, but find the error harmless on this record.

## FACTUAL AND PROCEDURAL HISTORY

*General Trial Testimony*

Defendant came to Sacramento to spend New Year's Eve 2010 with his nephew at Zelaya's apartment. Victim Lopez lived in the same apartment complex as Zelaya. Lopez was celebrating with his family and friends, including Victor Parra and Parra's wife, Marjourie "Massiel" Marin. At midnight, they all went outside to set off fireworks. Defendant, wearing his hair in braids, walked up to them and started bragging about clothing and his car. Lopez and Parra had never met defendant before. Defendant was being rude, appeared aggressive and seemed intoxicated.

Zelaya asked if defendant was bothering Lopez's group, and Parra told Zelaya to leave with defendant. Words were exchanged. Shortly thereafter, Lopez's group went back inside his apartment, where they were listening to music when defendant knocked at the door. Defendant attempted to enter the apartment. Parra stopped him by pushing him; defendant punched Parra, and they began to fight. Defendant ran from the scene, and Parra and Lopez chased after him. Zelaya followed Lopez and Parra. The group did not catch defendant.

Parra and the others were walking back to Lopez's apartment and saw Zelaya and another friend of defendant's who was wearing a white shirt. Zelaya and Lopez began arguing. Zelaya threw a punch at Lopez, hitting Lopez's wife, and he and Lopez began fighting, as did Parra and the man in the white shirt.

2

Lopez's stepson, J.B., described defendant as the man with two braids in his hair and Zelaya as the "chubby" man. He saw Parra fighting a man in a white shirt while Lopez was fighting Zelaya, and then saw defendant run up to Lopez from behind, grab him around his rib cage, and stab him in the back near his spine. The knife had a black handle and was about three inches long. J.B. also saw defendant try to hit Lopez with a beer bottle; the bottle broke on the ground and at some point Lopez sustained cuts on his head from broken glass. Someone fired a gun and the fighting stopped.

In addition to the stab wounds and injuries to his head, Lopez sustained injuries to his nose and eye, a broken tooth, and a broken ankle from falling in the mud. Marin called 911. She flagged down a security guard, Gary Anglin, who was working with his partner. The guards saw a heavy-set man climb the patio wall to Zelaya's apartment. They knocked on the door but no one answered. Someone inside turned off the lights, and they saw two men peeking through the blinds. When sheriff's deputies arrived and knocked on the door, they received no response. The deputies unlocked and opened the door and found defendant with Zelaya in the apartment. Defendant's appearance was distinctive because he had two braids running the length of his head. A search of the apartment revealed blood, as well as bloody clothing.

Lopez was hospitalized for three or four days. His ankle had to be surgically repaired. He had lacerations by his ear and on his back, both of which appeared to be caused by a knife. He had a skull fracture and a brain bruise, an injury requiring significant blunt force.

J.B. picked defendant out of a police line-up and identified him at trial.

Defendant's nephew testified he saw a fight between Zelaya and another man, and saw a beer bottle in the grass near the fight. He did not see defendant anywhere near the fight. After the fight ended, Zelaya and defendant's nephew went back to Zelaya's apartment. The nephew testified Zelaya and his girlfriend were immediately trying "to get rid of evidence of having a fight."

3

Victoria Zelaya (Victoria), Zelaya's wife (girlfriend at the time of the incident) testified that a group of friends and family, including defendant, were celebrating New Year's Eve. She saw people beating Zelaya, including two women and a man. She went to help Zelaya and was attacked by Marin, one of the women. When the fighting stopped, she helped Zelaya back to the apartment; he was muddy and bleeding. Defendant was already in the apartment, washing mud and blood off his hands. He told her and Zelaya to go to the bedroom and pretend to be asleep. He was screaming at her, in her face, to take off Zelayo's shirt, and seemed mostly mad, but also worried and scared.

*Testimony Regarding the Prior Incident Concerning Defendant and a Knife*

The trial court also permitted Victoria to testify at trial to an incident that occurred concerning defendant and a knife earlier that same evening, during dinner at Zelaya's apartment. Defendant had arrived at the apartment around 8:00 p.m. Shortly thereafter, at the dinner table, defendant got "agitated, irritated and mad" at a woman named Patty "because she was using the [N-word] a lot." Defendant grabbed a flat-bladed butcher knife from a kitchen drawer, held it on his lap, and told Patty not to use that word. Victoria was frightened and Patty looked afraid. Zelaya, who was also present, looked alarmed, took the knife from defendant, and placed it on the counter.

The knife was still on the counter when police arrived at the apartment and remained there for a few days. It was never collected by police and there was no evidence that it even resembled the knife used to stab Lopez.

*Objection and Ruling Regarding the Prior Incident*

Before the prosecutor elicited this testimony, defense counsel voiced an objection and the trial court held a sidebar conference, later describing the conference on the record as follows: "[Defense counsel] objected at side bar to this information coming before the jury. [¶] And based on the offer of proof I was given at side bar, I was convinced that this testimony involving the defendant reaching for the knife in response to the scenario

4

involving Patty was relevant and probative in this case. [¶] I want to indicate under 352, my opinion is that the probative value of the evidence was not substantially outweighed by any form of undue prejudice to [defendant's] interests by a confusion of any issues, or potentially misleading the jury. [¶] I think that it qualifies as relevant under 1102 -- I'm sorry --1101(b) in that it speaks to relevant issues involving opportunity, intent in preparation in that he is clearly accessing a knife *essentially moments before* allegations surface in which he is alleged to have used a knife in the attack on or against the victim in this case. [¶] So in terms of the proximity of his possession of that knife, or a knife to the use of a knife, it is *extremely close in time*. [¶] It speaks to – [¶] Well, the evidence, in summary, then, in my opinion, was relevant under 1101(b), and it was probative, and it was not subject to a 352 exclusion in terms of undue prejudice." (Emphases added.)

Defense counsel renewed his objection after the testimony, indicating the knife was not tied to the crime. There was no testimony it was even similar to the knife that was used in the crime; there was no suggestion defendant intended to use the knife and no evidence he used the knife in any manner. Defense counsel further argued that allowing testimony that defendant had earlier had a knife was prejudicial.

The trial court disagreed with defense counsel's characterization of the incident, saying "He was engaged in a verbal dispute with the woman seated at, essentially, a table or dinner table with him. [¶] And apparently in response to some portion of that conversation, which involved him chastising her for using a particular derogatory word, he reaches over to an available source of knives, which I am not sure is entirely clear, but I'm assuming it is a drawer, pulls out, essentially a kitchen knife . . . and places the knife on his lap. Doesn't use it. There's no description of him using it in terms of meal preparation. There's no indication he ever puts the knife back. And there's a clear indication from the current witness, Mrs. Zelaya, who testified that she was very intimidated by his conduct, so she at least took his conduct as a form of threat. [¶] So your client, *moments before he is alleged to have stabbed and sliced this victim*, has, in

5

an arguably threatening manner, *taken possession of a weapon consistent with the weapon that he's to be – he used outside*, although not specific as to length and handle, acquires it during the course of an argument, or heated discussion, and retains possession of it for some period of time on his lap, not on a table, not back into the drawer, not dispensed with in any other fashion. [¶] [This] totality of facts is what convinced me under 1101(b) that this does go to preparation, intent, opportunity. [¶] *And then it happens just moments before it's used is extremely significant in terms of his acquisition of it, potential retention of it and ultimate use of it. [¶] Had it been more attenuated in time by hours and certainly days, the analysis would have been entirely different. [¶] But, again, as described, this is moments before this confrontation-conflict occurs outside, and it's on that basis, as I indicated I allowed it.*" (Emphases added.)

The exchange with counsel continued, and the trial court added: "But it's the act of taking possession of [the knife] and retaining possession of it when compared with an allegation of subsequent use of a knife *moments later* to assault a third person. *It's the proximity of the two events* and the circumstances under which each of those events occur which make it relevant and probative of issues of preparation, plan -- preparation, intent and opportunity." (Emphases added.)

## DISCUSSION

Defendant contends the trial court abused its discretion by admitting the evidence that defendant "brandished an unrelated knife in an unrelated incident earlier in the evening." Defendant contends the testimony was inadmissible character evidence; on that point we agree. We disagree, however, that the error was prejudicial.

We review the trial court's rulings in admitting or excluding evidence for an abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) " 'Discretion is abused in the legal sense "whenever it may be fairly said that in its exercise the court in a given case exceeded the bounds of reason or contravened the uncontradicted evidence." ' "

6

(*Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1064 (*Esgro Central*).)

" 'When reviewing the admission of evidence of other offenses, a court must consider:  (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.  [Citation.]  Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." ' " (*People v. Butler* (2005) 127 Cal.App.4th 49, 60.)

"As a general rule, evidence the defendant has committed crimes other than those for which he is on trial is inadmissible to prove bad character, predisposition to criminality, or the defendant's conduct on a specific occasion." (*People v. Williams* (2009) 170 Cal.App.4th 587, 607.)  Under Evidence Code section 1101, subdivision (b), however, evidence that defendant committed a crime or other "bad act" is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."  "The admissibility of such evidence turns largely on the question whether the uncharged acts are sufficiently similar to the charged offenses to support a reasonable inference of the material fact they are offered to prove.  [Citations.]  'The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact.' " (*People v. Erving* (1998) 63 Cal.App.4th 652, 659-660.)

As we emphasized *ante* when recounting the relevant portions of the trial court's summary of its reasons for allowing the disputed testimony, the court relied heavily on *timing* to admit the evidence that defendant had earlier threatened someone with a knife as relevant to establish opportunity, preparation and intent, as well as to classify that evidence as more probative than prejudicial.  Finding that defendant took possession of

7

the knife "moments before he is alleged to have stabbed and sliced this victim," the court acknowledged that, had the timing of the two events had been more attenuated, even "by hours," the analysis would have been entirely different.

The record in this case definitively shows that the knife's possession at dinner and the subsequent stabbing around midnight were, indeed fact, separated by hours, not mere moments. The testimony established defendant arrived at the apartment around 8 p.m.; the kitchen knife incident occurred shortly thereafter. The fight(s) and stabbing of Lopez did not take place until after midnight, a minimum of four hours later. Thus, the trial court was mistaken as to a significant factor in its analysis, a factor it (correctly) acknowledged would have changed the outcome of that same analysis.

Here, the probative value of the evidence actually presented--that more than four hours before the stabbing, defendant acquired a knife that was not the knife used to stab the victim, and briefly possessed that knife while angry, apparently to threaten someone completely unconnected to the crimes that would occur four hours later--was negligible. The only significant probative value of this evidence was to show defendant's propensity to acquire knives during arguments--an impermissible purpose.[2] Because the trial court either received an incorrect off-the-record proffer of the evidence, or misunderstood the evidence that was represented at the sidebar conference and later during the testimony, it based its exercise of discretion on an incorrect interpretation of uncontradicted evidence.

_____

[2] In their briefing, the People argue that the disputed evidence "was probative because [defendant], by pleading not guilty and going to jury trial, was denying [the stabbing]. . . .The fact that he was willing to arm himself with a knife that very same evening in response to an event that angered him was highly probative evidence." With the forgoing passage, the People describe the probative value of *propensity* evidence--evidence that because the accused has engaged in like conduct on a prior occasion, he is more inclined to act in the same fashion on subsequent occasions. The People argue the correctness of the evidence's use for a clearly impermissible purpose. As we explained *ante*, the introduction of propensity evidence is not permitted in this type of case.

This resulted in an abuse of its discretion. (See *Esgro Central, supra,* 20 Cal.App.3d at p. 1064.)

The error, however, was harmless. The evidence showed defendant was aggressive and confrontational with Lopez and his group from the time the two groups merged. They exchanged words and defendant pursued them after they retreated to Lopez's apartment. When he was stopped from coming inside the apartment, he punched Parra. He ran from the scene after a fight broke out between Lopez and Zelaya. J.B. then saw defendant stab Lopez and hit him in the head with a beer bottle. J.B. described defendant as the man with braids, correctly selected defendant in a police lineup, and identified defendant as the assailant at trial. After the stabbing, defendant had blood and mud on his hands. He was screaming orders, and appeared worried and scared. He also took measures designed to avoid being contacted by the police, including returning quickly to Zelaya's apartment, remaining there in the dark and not opening the door while first the security guards and then the deputies were trying to get inside, and telling the apartment's occupants to pretend to be asleep.[3]

In light of the strong evidence of defendant's guilt, the error in admitting the disputed evidence was not prejudicial. Contrary to defendant's view, it is not reasonably

_____

[3] At trial, defendant refused self-defense instructions and argued that the People could not meet their burden as to proving his *identity* as the person who stabbed Lopez. In his briefing, although he admits that "the only issue reasonably in dispute was identity," defendant argues prejudice because the jury would have "excused [his] behavior" as it did Zelaya's, "had [the jury] not heard evidence that [defendant] was intimidating a girl with a knife earlier in the evening." This argument fails to persuade. In order for the jury to "excuse" defendant's behavior, given the instructions it received, it would have had to find that defendant was not the person who assaulted and stabbed Lopez, rather than merely "excuse" him for doing so because he was "simply an obnoxious aggressor who abandoned a fist fight and ran away, returning only to rescue [Zelaya] who was being beaten," as argued by defendant in his briefing.

probable that the jury would have reached a different result had the disputed evidence been correctly excluded.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## DISPOSITION

The judgment is affirmed.

      DUARTE      , J.

We concur:

      NICHOLSON      , Acting P. J.

      HOCH      , J.