613 S.E.2d 760

**The STATE, Respondent,**

v.

**Christopher F. DAVIS, Appellant.**

**No. 3970.**

Court of Appeals of South Carolina.

Heard March 9, 2005.

Decided March 28, 2005.

Rehearing Denied June 22, 2005.

366

Deputy Chief Attorney Joseph L. Savitz, III, Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelanka, Assistant Attorney General Jeffrey A. Jacobs, all of Columbia; and Solicitor Barbara R. Morgan, of Aiken, for Respondent.

ANDERSON, J.:

Christopher F. Davis appeals his convictions for murder, armed robbery, and possession of a firearm during the commission of a violent crime. Davis contends that admission of hearsay statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. We disagree and affirm.

## FACTUAL/PROCEDURAL BACKGROUND

A jury convicted Davis of robbing and murdering Paul Williams (the victim). Davis argues the trial judge erred by allowing Shawn Hicks, a witness at trial, to testify to hearsay statements made by Gregg Hill. Davis claims the statements by declarant Hill were testimonial in nature, and, pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), admission of the evidence violated his rights under the Confrontation Clause. The State contends the convictions should be affirmed because the statements were not testimonial and fit within the excited utterance exception to the rule against hearsay.

Hicks was selling drugs near the victim's house on the night of the murder. At Davis's trial, Hicks averred that he heard Davis, the victim, and Reggie Stevens arguing. Hicks then heard a gunshot and observed three individuals running from the victim's backyard. Witnesses, including Hicks, identified Stevens as one of the individuals, but could not identify the other two.

Five to ten minutes after hearing the gunshot, Hicks sold drugs to Stevens and Hill. Approximately fifteen to thirty minutes after the gunshot, Stevens and Hill returned with Davis, who was carrying a shotgun and a bag of coins. Davis purchased drugs from Hicks with the coins and offered to sell Hicks the shotgun. At this time, the hearsay statements at issue were uttered by Hill to Hicks. Hicks testified as follows:

Q. What, if anything, did anybody say to you to prevent you from buying it [the shotgun]?

A. Well, he told me not to purchase the shotgun.

Q. Who told you?

A. Greg Hill.

. . . .

Q. [W]hat did Greg Hill tell you that night . . . ?

A. Chris and Reggie went in the house.

Q. All right. Did he say anything about Paul being shot or anything?

A. Yeah. That's why he told me not to get the shotgun.

Q. Because?

A. Paul had been shot with it.

The trial judge found Hill's declarations admissible as statements made in the furtherance of a conspiracy and admitted the testimony over Davis's objection.

## STANDARD OF REVIEW

 In criminal cases, the appellate court sits to review errors of law only. *State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001); *State v. Wood,* 362 S.C. 520, 608 S.E.2d 435 (Ct.App. 2004). This Court is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Quattlebaum,* 338 S.C. 441, 527 S.E.2d 105 (2000); *State v. Landis,* 362 S.C. 97, 606 S.E.2d 503 (Ct.App.2004). This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases. *Wilson,* 345 S.C. at 6, 545 S.E.2d at 829. On review, we are limited to determining whether the trial judge abused his discretion. *State v. Reed,* 332 S.C. 35, 503 S.E.2d 747 (1998); *State v. Rochester,* 301 S.C. 196, 391 S.E.2d 244 (1990); *see also State*

*v. Corey D.,* 339 S.C. 107, 529 S.E.2d 20 (2000) (noting an abuse of discretion is a conclusion with no reasonable factual support). This Court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. *Wilson,* 345 S.C. at 6, 545 S.E.2d at 829; *State v. Mattison,* 352 S.C. 577, 575 S.E.2d 852 (Ct.App.2003).

## *LAW/ANALYSIS*

### I. Confrontation Clause

 Among other protections, the Sixth Amendment assures: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Sixth Amendment was incorporated and made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *State v. Mizzell,* 349 S.C. 326, 563 S.E.2d 315 (2002). The right of confrontation is essential to a fair trial in that it promotes reliability in criminal trials and insures that convictions will not result from testimony of individuals who cannot be challenged at trial. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Gillian,* 360 S.C. 433, 602 S.E.2d 62 (Ct.App.2004). The primary interest secured by the Confrontation Clause is the right to cross-examination. *Gillian* at 450, 602 S.E.2d at 71 (citing *State v. Shuler,* 344 S.C. 604, 545 S.E.2d 805 (2001); *Starnes v. State,* 307 S.C. 247, 414 S.E.2d 582 (1991)); *see also State v. Graham,* 314 S.C. 383, 444 S.E.2d 525 (1994) (observing that specifically included in defendant's Sixth Amendment right to confront a witness is the right to meaningfully cross-examine an adverse witness).

Certain hearsay statements traditionally have been admissible against a defendant even though the declarant was unavailable at trial and even though the defendant did not have a prior opportunity to cross-examine the declarant. Under *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *abrogated by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), hearsay statements were admissible if they bore "adequate 'indicia of reliability' "—a test that

could be met by showing the evidence (1) fell within a firmly rooted hearsay exception, or (2) bore particularized guarantees of trustworthiness. *Roberts* at 66, 100 S.Ct. 2531; *State v. Sanders*, 356 S.C. 214, 588 S.E.2d 142 (Ct.App.2003). However, in *Crawford*, the United States Supreme Court broke away from *Roberts* and radically changed the Confrontation Clause landscape.

### A. *Crawford v. Washington*

In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), Michael Crawford was convicted of assault for stabbing Kenneth Lee, who allegedly tried to rape Crawford's wife, Sylvia. At trial, the State played for the jury Sylvia's tape-recorded statement to the police describing the stabbing. Sylvia did not testify at trial due to Washington's marital privilege, which "generally bars a spouse from testifying without the other spouse's consent." *Id.* at 40, 124 S.Ct. at 1357 (citing Wash. Rev.Code § 5.60.060(1) (1994)). This privilege, however, does not extend to a spouse's out-of-court statements admissible under a hearsay exception. Whether Crawford saw a weapon in Lee's hands was a critical fact for his claim of self-defense. Because Sylvia was unable to testify at trial, Crawford claimed the admission of Sylvia's statement was a violation of his federal constitutional right under the Sixth Amendment to be confronted with the witnesses against him.

Following *Roberts*, the trial court allowed Sylvia's statement on the ground that it bore guarantees of trustworthiness. The Washington Court of Appeals reversed. The Washington Supreme Court then reinstated the conviction, and the Supreme Court of the United States granted certiorari.

Justice Scalia, writing for the seven-Justice majority, announced a fundamental change in Confrontation Clause jurisprudence:

> Where **testimonial statements** are involved, we do not think the Framers meant to leave the Sixth Amendments protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." ... To be sure, the Clauses ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It

commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Id.* at 61, 124 S.Ct. at 1370 (emphasis added). Crucial to the Courts decision was its emphasis on testimonial hearsay. "[I]f the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." *Id.* at 53, 124 S.Ct. at 1365 (footnote omitted). Thus,

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

*Id.* at 68, 124 S.Ct. at 1374 (footnote omitted).

## B. Defining the Line Between Testimonial and Nontestimonial

■ The holding in *Crawford* is unequivocal: "[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. at 68, 124 S.Ct. at 1374. However, the Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* (footnote omitted). Therefore, *Crawford's* reach largely will be determined by the definition courts give to the term "testimonial."

### 1. Guidance from *Crawford*

■ The *Crawford* Court established that whatever else testimonial covers, "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." 541 U.S. at 68, 124 S.Ct. at 1374. Looking to the language of the Sixth Amendment for guidance, the Court deduced that "[t]he text of the Confrontation Clause .... applies to 'witnesses' against the accused-in other words, those who bear testimony." *Id.* (citation omitted). The Court explained:

"Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." ... [A]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Id.*

The Court mentioned three formulations of "this core class of 'testimonial' statements":

(1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially";

(2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and

(3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"

*Id.* at 51–52, 124 S.Ct. at 1364 (citations omitted).

Additional instruction may be found in the Court's recurring references to what it called the "principal evil at which the Confrontation Clause was directed." Throughout the opinion, the Court interpreted the Clause by referencing its historical purpose of protecting against the "civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 50, 124 S.Ct. at 1363.

The continental civil-law tradition "condon[ing] examination in private by judicial officers" stands in historical contradistinction to the English common-law tradition of "live testimony in court subject to adversarial testing." 541 U.S. at 43, 124 S.Ct. at 1359 (citing 3 W. Blackstone, Commentaries on the Laws of England 373–74 (1768)). Yet, the civil-law practice eventually found its way to England:

Justices of the peace or other officials examined suspects and witnesses before trial. These examinations were sometimes read in court in lieu of live testimony, a practice that "occasioned frequent demands by the prisoner to have his 'accusers,' *i.e.* the witnesses against him, brought before him face to face...."

Pretrial examinations became routine under two statutes passed during the reign of Queen Mary in the 16th century.... These ... statutes required justices of the peace to examine suspects and witnesses in felony cases and to certify the results to the court.... [T]hey came to be used as evidence in some cases, ... resulting in an adoption of continental procedure.

*Id.* at 43–44, 124 S.Ct. at 1359–60 (citations omitted).

■ It was against this backdrop that the Confrontation Clause stage was set. Thus, the Sixth Amendment "must be interpreted" with this focus on preventing the civil-law use of *ex parte* examinations as evidence against the accused in mind. *Id.* at 50, 124 S.Ct. at 1363. *See id.* at 51, 124 S.Ct. at 1364 (noting that while *ex parte* examinations might sometimes be admissible under modern rules, the Framers certainly would not have condoned them); *id.* at 53, 124 S.Ct. at 1365 (observing that the current investigatory involvement of police officers in the production of testimonial evidence presents the same risk as the civil-law practices of justices of the peace); *id.* at 68, 124 S.Ct. at 1374 (finding that testimony at a preliminary hearing, before a grand jury, or at a former trial; and interrogation by police have the "closest kinship to the abuses at which the Confrontation Clause was directed").

In abrogating *Roberts*, the Court acknowledged suggestions by academics that the Court revise its Confrontation Clause doctrine to reflect more accurately the original understanding of the Clause. *See id.* at 60–61, 124 S.Ct. at 1369–70 (citing Akhil Reed Amar, The Constitution and Criminal Procedure 125–131 (1997); Richard Friedman, Confrontation: the Search for Basic Principles, 86 Geo. L.J. 1011 (1998)). The significance of the Court's citations to the scholarship of Professors Amar and Friedman is unclear. However, the differing views of the two professors as to what constitutes testimonial pro-

vide an efficacious framework for analyzing the myriad of post-*Crawford* Confrontation Clause cases.

## 2. Educatory Writings

 Amar suggests the Confrontation Clause "encompasses only those 'witnesses' who testify either by taking the stand in person or via government-prepared affidavits, deposition, videotapes, and the like." A. Amar, Confrontation Clause First Principles: A Reply to Professor Friedman, 86 Geo. L.J. 1045 (1998). Amar's focus is on the text of the Sixth Amendment and particularly on what was the common understanding of being a witness against someone during the Founding Era. Thus, clearly testimonial statements include prior testimony, depositions, and affidavits. Police station confessions and statements come within Amar's understanding of the Clause, although he admits they are a "tad trickier." *Id.* at 1049. Though confessions and statements are not made under oath, "they typically have other formal indicia of testimony." *Id.* For example, confessions and statements are purportedly precise renditions of answers to precise questions and are usually attested by the confessor's signature. "Thus, they may be treated as functional depositions/affidavits, and therefore as 'witnessing' under both the Fifth and Sixth Amendments." *Id.* (footnote omitted). Amar's definition excludes private accusations made out of court by one private person to another.

Friedman offers a "modestly broader definition" of testimonial. *See* 86 Geo. L.J. at 1043. Under Friedman's approach, "a declarant should be deemed to be acting as a witness when she makes a statement if she anticipates that the statement will be used in the prosecution or investigation of a crime." *Id.* at 1042. He offers five "rules of thumb":

> A statement made knowingly to the authorities that describes criminal activity is almost always testimonial. A statement made by a person claiming to be the victim of a crime and describing the crime is usually testimonial, whether made to the authorities or not. If, in the case of a crime committed over a short period of time, a statement is made before the crime is committed, it almost certainly is not testimonial. A statement made by one participant in a criminal enterprise to another, intended to further the

enterprise, is not testimonial. And neither is a statement made in the course of going about one's ordinary business, made before the criminal act has occurred or with no recognition that it relates to criminal activity.

*Id.* at 1042–43.

One writer has illustrated the difference between Amar's and Friedman's approaches as follows:

A is found dead in her bedroom, and her husband, B, is indicted for her murder. The police discover that A has left behind a diary detailing B's persistent history of domestic violence. The diary's cover page indicates that A authored it "to memorialize my husband's brutality in case something happens to me."

Paul Shechtman, 'Crawford' and the Meaning of Testimonial, 6/23/2004 N.Y.L.J. 4, (col 4.). Assuming the diary is admissible under the jurisdiction's hearsay rules, whether it will pass Confrontation Clause scrutiny depends upon whether the court adopts a definition of testimonial more akin to Amar's or Freidman's. Because the diary is not formalized and generated at the behest of the government, Amar's definition would find it nontestimonial. Freidman's approach, in contrariety, would deem the diary testimonial if the court found that A memorialized B's abuse in anticipation that the diary would be used against B in court in the event of her death.

### 3. Post–*Crawford* Decisions

Since *Crawford,* many courts have addressed whether particular statements are testimonial or nontestimonial. The issue has arisen under various factual circumstances, and statements tend to fall within one of several categories. For example, multiple courts have faced the question whether hearsay statements made to 911 dispatchers are testimonial under *Crawford.* These courts have employed divergent tests and rationales to reach varying conclusions. Additional categorical situations include statements made to police during initial field investigations; statements made by children to authorities or parents; and statements made to family, friends, or acquaintances. Considering the significance "testimonial" now plays in Confrontation Clause cases, a review of how other courts have begun to define the term is edifying.

### a. Statements Made During 911 Calls

One of the earliest opinions to address the reaches of "testimonial" is *People v. Moscat,* 3 Misc.3d 739, 777 N.Y.S.2d 875 (N.Y.City Crim.Ct.2004). The defendant in *Moscat* made a motion *in limine* to exclude the recording of a 911 call made by the complainant. Announcing its "early opportunity" to "work out in practice the meaning and concrete application of the new principles" set forth in *Crawford,* 777 N.Y.S.2d at 876, the *Moscat* court held:

A 911 call for help is essentially different in nature than the "testimonial" materials that *Crawford* tells us the Confrontation Clause was designed to exclude.

A 911 call is typically initiated not by the police, but by the victim of a crime. It is generated not by the desire of the prosecution or the police to seek evidence against a particular suspect; rather, the 911 call has its genesis in the urgent desire of a citizen to be rescued from immediate peril.

. . . .

Moreover, a 911 call can usually be seen as part of the criminal incident itself, rather than as part of the prosecution that follows. Many 911 calls are made while an assault or homicide is still in progress. Most other 911 calls are made in the *immediate* aftermath of the crime.

Typically, a woman who calls 911 for help because she has just been stabbed or shot is not contemplating being a "witness" in future legal proceedings; she is usually trying simply to save her own life.

*Moscat,* 777 N.Y.S.2d at 879–880. *See also People v. Conyers,* 4 Misc.3d 346, 777 N.Y.S.2d 274, 277 (N.Y.Sup.Ct. Queens Co.2004) (citing *Moscat* and finding 911 calls nontestimonial because it was clear to the court, "having heard the panicked and terrified scream of Ms. Conyers', that her intention in placing the 911 calls was to stop the assault in progress and not to consider the legal ramifications of herself as a witness in a future proceeding[.]").

*People v. Corella,* 122 Cal.App.4th 461, 18 Cal.Rptr.3d 770 (2004), is an early post-*Crawford* decision from the Court of Appeal of California. Corella's wife informed a 911 operator that her husband had hit her. Based on *Crawford's* treatment

of "police interrogation" as being analogous "to the official pretrial examination of suspects and witnesses by English justices of the peace before England had a professional police force," the *Corella* court concluded "a police interrogation requires a relatively formal investigation where a trial is contemplated." *Id.* at 776. In contrast to the facts of *Crawford*, Mrs. Corella's statements "were not 'knowingly given in response to structured police questioning,' and bear no indicia common to the official and formal quality of the various statements deemed testimonial by *Crawford*. Mrs. Corella, not the police, initiated the 911 call to request assistance." *Id.* Therefore, the statements were found nontestimonial.

*Leavitt v. Arave*, 383 F.3d 809 (9th Cir.2004), involved the brutal mutilation and murder of Danette Elg. The night before her murder, Elg phoned 911 when she heard someone attempting to break into her house. The police responded and found signs of attempted entry. Elg suspected that Leavitt was the perpetrator. She was killed the following night, and Leavitt was charged with her murder.

Leavitt argued that use at trial of the 911 recording violated his rights under the Confrontation Clause. Among other things, Elg had told the 911 dispatcher "she thought the prowler was Leavitt, because he had tried to talk himself into her home earlier that day, but she had refused him entry." *Id.* at 830 (footnote omitted).

After noting that *Crawford* left open a precise definition of testimonial, the *Leavitt* court concluded: "Although the question is close, we do not believe that Elg's statements are of the kind with which *Crawford* was concerned, namely, testimonial statements." *Id.* at 830 n. 22. The court explicated:

> Elg, not the police, initiated their interaction. She was in no way being interrogated by them but instead sought their help in ending a frightening intrusion into her home. Thus, we do not believe that the admission of her hearsay statements against Leavitt implicate "the principal evil at which the Confrontation Clause was directed. . . ."

*Id.*

In *Pitts v. State*, 272 Ga.App. 182, 612 S.E.2d 1, 2005 WL 127049 (2005), Pitts's wife called 911 and notified the dispatch-

er that Pitts had broken into her home and that another man was on her porch. She stated that

> Pitts broke into her house and was taking a shower, that he did not live there anymore, that he was running around her house with no clothes on, that he was not supposed to be in the county, that he was violating his probation, that "he's wanted," and that he was involved in a police chase the preceding weekend.

612 S.E.2d at 2, 2005 WL 127049 at *1.

The *Pitts* court determined that the statements made by Pitts's wife were not testimonial:

> The 911 calls ... do not come within the ambit of *Crawford.* Here, the caller's statements were made while the incident was actually in progress. The statements were not made for the purpose of establishing or proving a fact regarding some past event, but for the purpose of preventing or stopping a crime as it was actually occurring. The caller was requesting that police come to her home to remove Pitts, who she said had broken into her house. The statements made during the 911 calls were made without premeditation or afterthought.

612 S.E.2d at 5, 2005 WL 127049 at *4.

*State v. Wright,* 686 N.W.2d 295 (Minn.Ct.App.2004), found that statements made during a 911 call, moments after a criminal offense, and while still under the stress of the event, are not testimonial under *Crawford.* The court explained its decision as follows:

> A 911 call is usually made because the caller wants protection from an immediate danger, not because the 911 caller expects the report to be used later at trial with the caller bearing witness-rather, there is a cloak of anonymity surrounding 911 calls that encourages citizens to make emergency calls and not fear repercussion.

*Id.* at 302 (citation omitted).

*People v. Cortes,* 4 Misc.3d 575, 781 N.Y.S.2d 401 (Sup.Ct. Bronx Co.2004), found hearsay statements made to a 911 operator were testimonial and thus reached a different conclusion than did the courts in *Moscat* and *Conyers.* Factually, *Cortes* involved a 911 call by an unidentified and unavailable

witness to a shooting. The court began with the proposition that "[t]he circumstances of some 911 calls, particularly those reporting a crime, are within the definition of interrogation." *Id.* at 405. Emphasizing that "what is paramount in *Crawford* is the importance of the confrontation right[,]" *id.* at 414, the court opined: "A definition of 'testimonial' that takes the Supreme Court and the New York courts at their word when they highly value the confrontation right cannot be limited to formal documents, affidavits or depositions." *Id.* (footnote omitted).

The court adopted the following test:

> A test . . . in accord with the highly prized protection of the right of confrontation is the objective one of whether the pretrial statement of a person other than the defendant, admitted through the testimony of another person, on tape or in writing, was made primarily for another purpose. If so, it need not be confronted. Under the test, for example, traditional business records, hospital diagnostic information, public records, res gestae, and co-conspirator statements would be admissible at trial without cross-examination. Whether some other statement falls within the test is to be determined by the circumstances in which the statement was made.

*Id.* at 414–15 (footnote omitted).

Under the objective speaker test, "When a 911 call is made to report a crime and supply information about the circumstances and the people involved, the purpose of the information is for investigation, prosecution, and potential use at a judicial proceeding; it makes no difference what the caller believes." *Id.* at 415. Thus, statements made to the 911 dispatcher were deemed testimonial.

Like *Cortes*, the court in *People v. Dobbin*, 6 Misc.3d 892, 791 N.Y.S.2d 897, 2004 WL 3048648 (Sup.Ct. New York Co.2004), found hearsay statements to a 911 dispatcher testimonial. The caller in *Dobbin* phoned 911 to report the robbery of a parking lot attendant which was in progress. An account of the robbery, the location of the robbery, and a description of the perpetrator were given to the operator. The *Dobbin* court reasoned:

The 911 call, in this case, contains a solemn declaration for the purpose of establishing the fact that the defendant is committing a robbery. The caller is making a formal out of court statement to a government officer for the purpose of establishing this fact. The caller's statement is not a "casual remark to an acquaintance." The caller was officially reporting a crime to the government agency entrusted with this very serious and important function. As such, the 911 call falls within the category of out of court statements which reflect the focus of the Confrontation Clause; the out of court statements of " 'witnesses' against the accused in other words, those who 'bear testimony.' "

Second, further guidance as to whether the 911 call's content is a testimonial statement is provided in *Crawford* when we are given various examples of the type of out of court statements that fit within the class of testimonial statements. The broad categories of "various formulations of this core class of 'testimonial' statements," are "*ex parte* in-court testimony or its functional equivalent" and out of court "similar pre-trial statements." Among this type of pretrial statements, the Supreme Court lists, "pre-trial statements that declarants would reasonably expect to be used prosecutorially," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

791 N.Y.S.2d at 900–01, 2004 WL 3048648 at *3 (citations omitted). The court found "[t]he 911 statement fits . . . within the type of statement that was 'made under the circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " 791 N.Y.S.2d at 901, 2004 WL 3048648 at *3 (citation omitted).

Additionally, the court found the statement analogous to a statement made during a police interrogation. The statement was "obtained by 'Police Operator 1521.' " 791 N.Y.S.2d at 901, 2004 WL 3048648 at *4. Thus, "[g]iven *Crawford's* broad statement that testimonial statements include the 'functional equivalent' of some of the 'various formulations of the core class of testimonial statements,' it follows that a formal statement to a government officer, who is a police operator officially designated to formally obtain these statements, is the

functional equivalent of a formal statement to a police officer."
*Id.* Concomitantly, the court found the statement was testimonial.

In *State v. Powers*, 124 Wash.App. 92, 99 P.3d 1262 (2004), the Washington Court of Appeals weighed in on the testimonial debate by adopting a case-by-case approach to 911 calls. Powers appealed his conviction for violating a domestic violence protection order on the ground that the trial court erred in admitting a 911 recording. The victim called 911 and informed the dispatcher that Powers was in her home in violation of an order. The police promptly responded, and Powers was apprehended. On appeal, he argued that the caller's statement to the 911 operator fell squarely within the pretrial statements that declarants would reasonably expect to be used prosecutorially.

The court took note of the "dichotomy between a plea for help and testimonial statements in 911 calls," *id.* at 1265 (citing Richard Friedman & Bridget McCormack, Dial–In Testimony, 150 U. Pa. L.Rev. 1177 (2002)), and announced:

> We reject the State's request for a bright line rule admitting all 911 recordings because a rule would likely result in the vice *Crawford* seeks to redress: A "capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." 541 U.S. at [63], 124 S.Ct. at 1371. Instead, we hold that the trial court, on a case-by-case basis, can best assess the proposed admission of a 911 recording as testimonial or nontestimonial and whether the statement originates from interrogation.

99 P.3d at 1266.

The record showed that the victim "called 911 to report Power's violation of the existing protective order and described Powers to assist in his apprehension and prosecution, rather than to protect herself or her child from his return." *Id.* Accordingly, the call was deemed testimonial.

The Illinois Appellate Court, in *People v. West*, 291 Ill.Dec. 72, 823 N.E.2d 82, 2005 WL 44003 (2005), reviewed *Moscat; Cortes,* and *Powers* and found those opinions helpful in formulating the following approach to statements made to 911 operators:

First, as in *Powers,* we reject any bright line rule which would hold a 911 call testimonial or not testimonial in nature. Rather, we believe that a court should determine, on a case-by-case basis, whether the statement made to the 911 dispatcher was: (1) volunteered for the purpose of initiating police action or criminal prosecution; or (2) provided in response to an interrogation, the purpose of which was to gather evidence for use in a criminal prosecution. In the first instance, the statement is testimonial in nature because an objective individual would reasonably believe that when he or she reports a crime they are "bearing witness" and that their statement will be available for use at future criminal proceedings. *Cortes,* 781 N.Y.S.2d at 415–16. In the later case, the statement is testimonial in nature because it is the product of evidence-producing questions, the responses to which, if used to convict a defendant, would implicate the central concerns underlying the confrontation clause. *Crawford,* 541 U.S. at [52–54], 124 S.Ct. at 1365. Second, in performing this analysis, a court should examine a caller's statement in the same manner as it would a victim's statement to a treating medical professional. Accordingly, statements which are made "to gain immediate official assistance in ending or relieving an exigent, perhaps dangerous, situation" (Richard Friedman, Bridget McCormack, Dial–In Testimony, 150 U. Pa. L. Rev 1171, 1242 (2002)) are comparable to those made to medical personnel regarding "descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof" (725 ILCS 5/115–13 (West 2002)) and, as such, are not testimonial in nature. However, statements volunteered for the purpose of "invoking police action and the prosecutorial process" (*Cortes,* 781 N.Y.S.2d at 416), or responses to questions posed for the purpose of collecting information "useful to the criminal justice system," (150 U. Pa. L. Rev. at 1242) are testimonial in nature. 823 N.E.2d at 91, 2005 WL 44003 at *8.

Based on its formulation, the *West* court found statements made to a 911 operator "concerning the nature of the alleged attack, ... medical needs, ... age and location" were nontestimonial, whereas statements which described the victim's vehicle, "the direction in which her assailants fled, and the

items of personal property they took" were testimonial. 823 N.E.2d at 91, 2005 WL 44003 at *9

### b. Statements Made During Police Investigations

As with statements to 911 operators, courts have struggled with statements made to police during field investigations. Crawford's holding explicitly finds that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." 541 U.S. at 52, 124 S.Ct. at 1364. The Court used the term "'interrogation' in its colloquial, rather than any technical legal, sense." 541 U.S. at at 53 n. 4, 124 S.Ct. at 1365 n. 4 (citation omitted). Therefore, various definitions of "interrogation" are apt to arise, and the Court limited its guidance to holding that "Sylvia's recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." *Id.* Whether *all* statements made to police, regardless of the context in which they were made, should be treated as testimonial has been viewed differently by courts.

In *Lopez v. State,* 888 So.2d 693 (Fla.Dist.Ct.App.2004), police were dispatched to an apartment complex to investigate a report of kidnapping and assault. Once there, Officer Gaston encountered Ruiz in the parking lot. The officer asked Ruiz what had occurred, and Ruiz replied that the defendant had held him at gunpoint in Ruiz's car and that the gun was still in his vehicle. A jury convicted Lopez for possession of a firearm by a convicted felon. Ruiz was not available for trial, and the defendant appealed his conviction, contending the admission of Ruiz's statement to police violated his rights under the Confrontation Clause.

The *Lopez* court analyzed Ruiz's statement under each of the three formulations of the core class of testimonial statements given by the *Crawford* Court. First, although the statement was in response to a question by a police officer, the court found it "doubtful that the questioning could be regarded as an 'interrogation.'" *Id.* at 698. Second, the statement did not fall within the second category of out-of-court statements made in "'formalized testimonial materials'" because "it was not made with the kind of formality the Court was referring to in *Crawford.*" *Id.* "It was not the kind of solemn or deliberate statement a person would make in an affidavit or

a deposition." *Id.* Finally, whether the statement would lead an objective witness reasonably to believe that the statement would be available for use at a later trial was "a more difficult question." *Id.* Under this third category, the court's focus was on "the purpose for which the statement [wa]s made, not on the emotional state of the declarant." *Id.* at 699. In contrast to a spontaneous statement made to a friend or family member,

> a startled person who identifies a suspect in a statement made to a police officer at the scene of a crime surely knows that the statement is a form of accusation that will be used against the suspect. In this situation, the statement does not lose its character as a testimonial statement merely because the declarant was excited at the time it was made.

*Id.* at 699–700. Therefore, the court concluded that Ruiz's statement was testimonial:

> While it is true that Ruiz was nervous and speaking rapidly, he surely must have expected that the statement he made to Officer Gaston might be used in court against the defendant. . . . Even in his excitement, Ruiz knew that he was making a formal report of the incident and that his report would be used against the defendant.

*Id.* at 700.

Georgia courts have adopted a broad interpretation of interrogation and have generally found statements made to police are testimonial. In *Moody v. State,* 277 Ga. 676, 594 S.E.2d 350 (2004), Moody was charged with the murder of Rebecca Norman. The Confrontation Clause issue arose from statements Norman made to police two years before her murder, when Moody had fired a shotgun into her bedroom window. At trial, an officer testified about what Norman told him shortly after Moody shot into the bedroom in which she was sleeping. The court's discussion of testimonial was limited to the following statement made in a footnote: "the [*Crawford*] Court stated that the term [testimonial] certainly applies to statements made in a police interrogation, and it appears that the term encompasses the type of field investigation of witnesses at issue here." *Id.* at 354 n. 6.

The Georgia Supreme Court, in *Bell v. State,* 278 Ga. 69, 597 S.E.2d 350 (2004), cited *Crawford* and *Moody* to support its

conclusion that the trial court erred in admitting "out-of-court statements that the victim had made to police officers during the course of the officers' investigations of complaints made by the victim against Mr. Bell." *Id.* at 353. *See also Brawner v. State,* 278 Ga. 316, 602 S.E.2d 612, 613 (2004) (finding testimonial the statement a witness gave to police several days after shooting claiming the witness observed the appellant shoot the victim several times while the victim lay on the ground saying "Don't kill me."); *Jenkins v. State,* 278 Ga. 598, 604 S.E.2d 789, 795 (2004) ("Since *Crawford v. Washington,* we have interpreted 'testimonial statements' to include those statements made by witnesses to police officers investigating a crime.") (citing *Moody; Bell,* and *Brawner*) (footnote omitted); *Pitts v. State,* 272 Ga.App. 182, 612 S.E.2d 1, 5, 2005 WL 127049 *3 (Ga.App.2005) ("Since *Crawford,* our courts have interpreted "testimonial" statements to include those statements made by witnesses to police officers investigating a crime.").

However, a number of courts have concluded statements are not testimonial solely because they are made to police. In *People v. Mackey,* 5 Misc.3d 709, 785 N.Y.S.2d 870 (N.Y.City Crim.Ct.2004), eight on-duty police officers were patrolling in a marked van when the victim waved to them, requesting assistance. The victim was crying, and her face was red and swollen. One of the officers, Officer Melenciano, "asked her what was wrong and she stated that her boyfriend had punched her in the face and pushed her down and then tried to take her children." *Id.* at 871.

The *Mackey* court began by recognizing that

courts in New York and throughout the country have held that responses to police officers during a preliminary field investigation are not barred as "testimonial" statements under *Crawford* if the statements and the circumstances in which the statements were made lack the requisite formality to constitute a police interrogation. *See People v. Newland,* 6 A.D.3d 330, 775 N.Y.S.2d 308 (1st Dept.2004) (concluding that a brief, informal remark to an officer conducting a field investigation which was not made in response to structured police questioning should not be considered a testimonial statement); *State v. Forrest,* 164 N.C.App. 272, 596 S.E.2d 22 (Court of Appeals of North Carolina, 2004) (holding

statements initiated by complaining witness to police imme-
diately after rescue were non-testimonial in nature). *But cf.
Moody v. State*, 277 Ga. 676, 594 S.E.2d 350 (Ga.2004)
(finding statements of deceased victim to a police officer
during a field investigation of a previous, separate incident
two years prior involving defendant were testimonial and
admission of this testimony was error).

*Id.* at 872–73.

The court engaged in a "fact-specific analysis of the particu-
lar nature and circumstances of the statements" that consid-
ered

> the extent of a formalized setting in which the statements
> were made, if and how the statements were recorded, the
> declarant's primary purpose in making the statements,
> whether an objective declarant would believe those state-
> ments would be used to initiate prosecutorial action and
> later at trial, and specifically with cases involving state-
> ments to law enforcement, the existence of any structured
> questioning and whether the declarant initiated the contact.

*Id.* at 873–74. Under the facts of *Mackey*, the victim's
statements were nontestimonial and their admission did not
violate the Confrontation Clause.

*Hammon v. State*, 809 N.E.2d 945 (Ind.Ct.App.2004), in-
volved a conviction for domestic battery. Officer Mooney was
dispatched to a residence occupied by Hammon and A.H., the
victim. Officer Mooney separated Hammon from A.H., and
A.H. told the officer that Hammon had thrown her down into
shattered glass and punched her twice in the chest. A.H. did
not testify at trial. Instead, the court allowed Officer Mooney
to relate A.H.'s statements to the jury.

> The *Hammon* court held:

> the statement A.H. gave to Officer Mooney was not a
> "testimonial" statement. It appears to us that the common
> denominator underlying the Supreme Court's discussion of
> what constitutes a "testimonial" statement is the official and
> formal quality of such a statement. A.H.'s oral statement
> was not given in a formal setting even remotely resembling
> an inquiry before King James I's Privy Council; it was not
> given during any type of pre-trial hearing or deposition; it

was not contained within a "formalized" document of any kind.

*Id.* at 952 (footnote omitted).

Further, the court addressed the closer question whether A.H.'s statement was the product of a police interrogation:

> [W]e observe that the Supreme Court chose not to say that any police *questioning* of a witness would make any statement given in response thereto "testimonial"; rather, it expressly limited its holding to police "interrogation." We conclude this choice of words clearly indicates that police "interrogation" is not the same as, and is much narrower than, police "questioning."

*Id.*

Thus, the court reached the conclusion that "when police arrive at the scene of an incident in response to a request for assistance and begin informally questioning those nearby immediately thereafter in order to determine what has happened, statements given in response thereto are not 'testimonial.'" *Id.*

Additionally, A.H. completed a battery affidavit that was admitted at trial. The *Hammon* court noted that the battery affidavit "would probably qualify as a 'testimonial' statement," *id.* at 952 n. 5, but found admission of the affidavit harmless because it was cumulative of Officer Mooney's properly admitted testimony regarding A.H.'s statements. *Id.* at 948 n. 1 (citation omitted). *See also Fowler v. State,* 809 N.E.2d 960, 964 (Ind.Ct.App.2004), *transfer granted* (Dec. 9, 2004) ("An unrehearsed statement made without reflection or deliberation, as required to be an 'excited utterance,' is not 'testimonial' in that such a statement, by definition, has not been made in contemplation of its use in a future trial.") (citations omitted).

In *State v. Barnes,* 854 A.2d 208 (Me.2004), Barnes was convicted of murdering his mother. The testimony at trial included that of an officer who asseverated that prior to the murder, Barnes's mother "drove herself to the police station .... and said that her son had assaulted her and had threatened to kill her more than once during the day." *Id.* at 209. The *Barnes* court found the statements nontestimonial because: (1) the police did not seek out Barnes's mother; (2) her

statements were made while she was still under the stress of the attack; and (3) she was not responding to "tactically structured police questioning as in *Crawford*, but was instead seeking safety and aid." *Id.* at 211.

In *Leavitt v. Arave*, 383 F.3d 809 (9th Cir.2004), after concluding that Elg's statements to the 911 dispatcher were nontestimonial, *see supra*, the Ninth Circuit Court of Appeals turned to Elg's statements made to the police who responded to the 911 call. The court found that Elg

> was in no way being interrogated by [police] but instead sought their help in ending a frightening intrusion into her home. Thus, we do not believe that the admission of her hearsay statements against Leavitt implicate the principal evil at which the Confrontation Clause was directed. . . .

*Id.* at 830 n. 22 (internal quotation marks and citation omitted).

After determining that statements to the 911 operator were not testimonial, the court in *State v. Wright*, 686 N.W.2d 295 (Minn.Ct.App.2004), *review granted* (Nov. 23, 2004), declined to answer the "closer question" whether statements made to police were testimonial. The *Wright* court found that any error in admission would be harmless. However, the court did state, in dictum, "We are not convinced that a police response to an incident when the victims are in distress and primarily concerned with ensuring that their assailant has been apprehended satisfies any of the formulations or examples of testimonial hearsay provided by the Supreme Court." *Id.* at 305.

### c. Statements by Children

A third category of cases exploring the definition of testimonial is that of statements by children. This category may be bifurcated into statements made to government personnel and statements made to parents or other persons not employed by the government. The cases often, though not always, arise where the child declarant has been sexually abused. Most courts have found that a child's statement to a government figure is testimonial. However, they do not always follow a consistent rationale.

In *Snowden v. State,* 156 Md.App. 139, 846 A.2d 36 (Spec.App.2004), shortly after the Supreme Court issued the *Crawford* opinion, the Court of Special Appeals of Maryland addressed *Crawford's* applicability to statements by children in the context of child abuse. Snowden was convicted of seven counts of child abuse and related offenses. The convictions arose from alleged sexual contact with three different minor females, two of whom were ten years old and one of whom was eight. The children did not testify at trial; instead, a social worker was allowed to relate their testimony pursuant to a Maryland statute. *See id.* at 39 (quoting Md.Code Ann., Crim. Proc. § 11–304 (2002)). The social worker based her testimony on one unrecorded interview with each of the children, in which she used non-leading and general questions to elicit details of the abuse.

The *Snowden* court was persuaded the children's statements, testified to by the social worker, were testimonial:

> As the trial court stated: "The children were interviewed for the expressed purpose of developing their testimony by [the social worker], under the relevant Maryland statute that provides for the testimony of certain persons in lieu of a child, in a child sexual abuse case...." In light of *Crawford,* appellant is entitled to a new trial at which the State will be prohibited from introducing any testimonial hearsay declarations of a person who (1) is available to testify, or (2) made the testimonial hearsay statements on an occasion at which the defendant did not have an opportunity for cross-examination.

*Id.* at 47 (footnotes omitted).

In *People v. Sisavath,* 118 Cal.App.4th 1396, 13 Cal.Rptr.3d 753 (2004), Sisavath was accused of sexually abusing two children whom the court referred to as Victim 1 and Victim 2. The evidence at trial included two hearsay statements of Victim 2: the first a statement to a police officer and the second a videotaped interview with a "trained interviewer at Fresno County's Multidisciplinary Interview Center (MDIC)." *Id.* at 756. The trial court admitted both statements, but the California Court of Appeal reversed.

First, the court found it "clear that Victim 2's statement to Officer Vincent was testimonial under *Crawford." Id.* at 757.

This statement was " 'knowingly given in response to structured police questioning.' The People concede this." *Id.*

Second, the court addressed the videotaped interview, which took place after the original complaint had been filed and a preliminary hearing had been held. "The deputy district attorney who prosecuted the case was present in the interview, along with an investigator from the district attorney's office. The interview was conducted by a 'forensic interview specialist.' " *Id.* Therefore, the court concluded: "Under these circumstances, there is no serious question but that Victim 2's statement was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 757–58 (internal quotation marks and citation omitted).

Thus, the *Sisavath* court adopted the third and most expansive *Crawford* formulation of testimonial, and concluded that the Supreme Court's reference to "objective witness" meant an "objective observer," not "an objective witness in the same category of persons as the actual witness—here, an objective four-year-old." *Id.* at 758 n. 3.

*People v. Vigil,* 104 P.3d 258 (Colo.Ct.App.2004), *cert. granted* (Dec. 20, 2004), reached a similar result as *Sisavath,* but with a potentially significant difference in reasoning. The defendant in *Vigil* was convicted for sexually assaulting a seven-year-old boy. At trial, the State showed portions of a videotaped police interview of the child. The boy did not testify at trial, and the defendant argued that admission of the videotape violated his rights under the Confrontation Clause.

In finding the videotape was testimonial, the *Vigil* court rejected the People's argument that the statement was not testimonial because "it was not made during the course of a police interrogation and because a seven-year-old child would not reasonably expect his statements to be used prosecutorially." *Id.* at 262. The court explained that "[a]lthough the interview in this case was conducted in a relaxed atmosphere, with open-ended, nonleading questions, and although no oath was administered at the outset, it nevertheless amounted to interrogation under *Crawford.*" *Id.* The court noted that the interviewing officer "told [the child] he needed to tell the truth," and when officer asked the child what should happen to

the defendant, "the child replied that defendant should go to jail." *Id.* Therefore, while the *Vigil* court did not expressly state the objective witness test should consider the age of the actual witness, the court did apply such a test under the facts before it.

In *People ex rel. R.A.S.*, 111 P.3d 487, 2004 WL 1351383 (Colo.Ct.App.2004), the defendant, a juvenile, allegedly "touched the genitals of a four-year-old boy (the victim) and persuaded the victim to perform oral sex upon him." *Id.* at 488, 2004 WL 1351383 at *1. The victim did not testify. Instead, a police investigator, who conducted a videotaped forensic interview of the victim, testified. The videotaped interview was introduced as well.

The court noted that "the statement was taken by an investigating officer in a question and answer format appropriate to a child." *Id.* at 490, 2004 WL 1351383 at *4. The court then announced its holding: "The statement was 'testimonial' within even the narrowest formulation of the Court's definition of that term. We thus conclude that the statement was not admissible at trial." *Id.* (citations omitted).

*State v. Courtney*, 682 N.W.2d 185 (Minn.Ct.App.2004), differs from *Snowden; Sisavath; Vigil*, and *R.A.S.* in that the child in *Courtney* was not sexually abused, but was a witness in a domestic assault action. However, the rationale behind finding the minor child's statement testimonial is similar to the child abuse cases.

Courtney was tried and convicted for assaulting the mother of the child declarant. The child made statements during a videotaped interview that on the night in question, she heard things breaking, heard her mother crying, and witnessed Courtney threatening her mother with two guns. The State offered the videotaped interview at trial, and on appeal the court held:

> [The child's] statement is testimonial. A child-protection worker, along with a law enforcement officer, interviewed [the child] for the purpose of developing a case against Courtney.... At one point, the interview was stopped by the police officer when he directed the child-protection worker to ask [the child] to draw the guns she saw Court-

ney allegedly use to threaten [the victim]. The circumstances under which the interview was conducted show it was made in preparation for the case against Courtney.

*Id.* at 196.

The Michigan Court of Appeals, has found, in dictum, that a child's statements to an interviewer are not testimonial. In *People v. Geno,* 261 Mich.App. 624, 683 N.W.2d 687 (2004), the court found the defendant had not properly preserved and presented a *Crawford* claim, but that even if he had, the child's statement "did not constitute testimonial evidence under *Crawford,* and therefore was not barred by the Confrontation Clause." *Id.* at 692. There, the defendant allegedly sexually assaulted his girlfriend's two-year-old daughter. The contested hearsay statement was uttered during an interview by the Children's Assessment Center. "The interviewer noticed blood in the child's pull-up underpants and asked the child if she 'had an owie?' The child answered, 'yes, Dale [defendant] hurts me here,' pointing to her vaginal area." *Id.* at 689.

In ruling the hearsay nontestimonial, the court explicated:

The child's statement was made to the executive director of the Children's Assessment Center, not to a government employee, and the child's answer to the question whether she had an "owie" was not a statement in the nature of *ex parte* in-court testimony or its functional equivalent.

*Id.* at 692 (internal quotation marks and citation omitted).

At least two cases have held a child's statement to a parent is nontestimonial. In *Herrera–Vega v. State,* 888 So.2d 66 (Fla.Dist.Ct.App.2004), the court found that testimonial evidence "does not appear to include the spontaneous statements made by D.H. to her mother while being dressed, nor does it include D.H.'s statements to her father." *Id.* at 69. Similarly, the court in *Somervell v. State,* 883 So.2d 836 (Fla.Dist.Ct. App.2004) held: "It seems to us that statements that a mother hears from her autistic child does not fit within the umbra or penumbra of" any of the categories of testimonial set forth by the *Crawford* Court. *Id.* at 838.

#### d. Statements Made to Family, Friends, or Acquaintances

Finally, numerous opinions from around the country have determined that statements made to friends, family, or acquaintances do not constitute testimonial hearsay.

In *United States v. Hendricks*, 395 F.3d 173 (3rd Cir.2005), a grand jury indicted Hendricks and several other defendants for conspiracy, narcotics possession and distribution, and money laundering. At issue was the admissibility of surveillance tapes obtained pursuant to a court order under 18 U.S.C. § 2510 *et seq.* The *Hendricks* court found the taped statements were not the type of statements *Crawford* meant to affect:

> First and foremost, the recorded conversations here at issue neither fall within nor are analogous to any of the specific examples of testimonial statements mentioned by the Court. *Crawford*, 541 U.S. at [68], 124 S.Ct. at 1374 (listing "prior testimony [given] at a preliminary hearing, before a grand jury, or at a former trial[,] and . . . police interrogations" as examples of obviously testimonial statements). Second, the recorded conversations do not qualify as "testimonial" under any of the three definitions mentioned by the Court. They are not "*ex parte* in-court testimony or its functional equivalent," nor are they "extrajudicial statements . . . contained in formalized . . . materials, such as affidavits, depositions, prior testimony, or confessions." 541 U.S. at [51–52], 124 S.Ct. at 1364 (internal citations and quotations omitted). Each of the examples referred to by the Court or the definitions it considered entails a formality to the statement absent from the recorded statements at issue here. Even considered in perspective of the broad definition offered by the NACDL, the Title III recordings cannot be deemed "testimonial" as the speakers certainly did not make the statements thinking that they "would be available for use at a later trial." *Crawford*, 541 U.S. at [52], 124 S.Ct. at 1364 (quoting Brief of NACDL). Rather, the very purpose of Title III intercepts is to capture conversations that the participants believe are not being heard by the authorities and will not be available for use in a prosecution.

A witness "who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford,* 541 U.S. at [51], 124 S.Ct. at 1364. The Title III recordings here at issue are much more similar to the latter than the former. Therefore, as recognized by other courts that have addressed similar issues, we find that the surreptitiously monitored conversations and statements contained in the Title III recordings are not "testimonial" for purposes of *Crawford.*

395 F.3d at 181.

In *Ramirez v. Dretke,* 398 F.3d 691, 2005 WL 174643 (5th Cir.2005), Ramirez was convicted of murdering his ex-wife's boyfriend. Ramirez hired Bell to assist him with the murder. Prior to the killing, Bell told Hoogstra that Ramirez had hired Bell to kill a fireman, and after the murder, Bell described the killing to Hoogstra. Both Ramirez and the State maintained that "Bell's out-of-court statements [were] not 'testimonial evidence' as that term is used in *Crawford." Id.* at 695 n. 3, 2005 WL at *3 n. 3. The court agreed, noting there is "nothing in *Crawford* to suggest that 'testimonial evidence' includes spontaneous out-of-court statements made outside any arguably judicial or investigatory context." *Id.*

Evans was convicted of murdering his estranged wife. At issue in *Evans v. Luebbers,* 371 F.3d 438 (8th Cir.2004), were a number of statements the wife made before her death, including that she was afraid of Evans, that "I'll be like another Nicole Simpson," that she was abused by Evans, and that she was planning to divorce him. *Id.* at 444. The court, with little explanation, found *Crawford* inapplicable because the hearsay statements of Evans's wife did not fit within "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; [or] to police interrogations." *Id.* at 445 (internal quotation marks and citation omitted). *See also United States v. Manfre,* 368 F.3d 832, 838 n. 1 (8th Cir.2004) (finding hearsay statements made to "loved ones or acquaintances ... are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks.").

In *People v. Butler,* 127 Cal.App.4th 49, 25 Cal.Rptr.3d 154, 2005 WL 428210 (2005), a homicide witness made spontaneous

statements to co-workers regarding a murder. The court rejected appellant's argument that an objective observer would reasonably foresee that the statements could be used in a prosecution. In the court's view, this argument was contrary to *Crawford's* focus on "statements given in lieu of oral testimony, such as an affidavit, or given to a government official in a formal statement." *Id.* at 162, 2005 WL at *6.

*People v. Cervantes,* 118 Cal.App.4th 162, 12 Cal.Rptr.3d 774 (2004), involved a statement made to an acquaintance who rendered medical aid following a murder. A neighbor of Morales, one of three defendants, was a surgical medical assistant who had known Morales for approximately twelve years. The court found that Morales's statement to his neighbor was not similar to grand jury testimony or a statement taken by an officer during an investigation. The statement was testimonial, "if at all, only under the definition quoted from the amici brief . . . which asserted testimonial statements include those made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id.* at 782 (internal quotation marks and citation omitted). The court rejected the argument that Morales made the statement knowing his neighbor would repeat it to police. Instead, the court found:

> . . . Morales sought medical assistance from a friend of long standing who had come to visit his home. Morales's statement appears to have been made without any reasonable expectation it would be used at a later trial. Rather, it seems far more likely Morales expected Ojeda would not repeat anything he told her to the police. Indeed, Ojeda admitted she knew appellants were gang members and indicated she was afraid to testify in this case.

*Id.* at 783.

In *State v. Rivera,* 268 Conn. 351, 844 A.2d 191 (2004), the defendant and Michael Glanville allegedly murdered Audrey Lover and set fire to her house. The *Rivera* court found that incriminating statements Glanville made to his nephew during a car ride did not fall within any of the formulations of the core class of testimonial statements discussed in *Crawford.* *Id.* at 202.

In *Demons v. State*, 277 Ga. 724, 595 S.E.2d 76 (2004), the victim confided in Bohr, a coworker, several days before the victim was murdered. Bohr testified that "the victim was distressed and had bruises on his upper arms and chest, that he began crying and told her where the bruises came from, that she had never seen anybody so afraid of anyone else, and that he said that Demons was going to kill him." *Id.* at 79. The statements were declared nontestimonial because they "were not remotely similar to such prior testimony or police interrogation, as they were made in a conversation with a friend, before the commission of any crime, and without any reasonable expectation that they would be used at a later trial." *Id.* at 80 (citation omitted).

*People v. Shepherd*, 263 Mich.App. 665, 689 N.W.2d 721 (2004), found statements the defendant's boyfriend, Bobby Butters, made to relatives visiting him in jail, which jail guards overheard, were "clearly not testimonial." *Id.* at 729. Butters "was speaking to relatives, not to the guards, and made spontaneous, unprompted comments regarding his role in the fleeing and eluding and assault." *Id.* Thus, "[e]ven under the broadest definition of testimonial, it is unlikely that Mr. Butters would have reasonably believed that the statements would be available for use at a later trial." *Id.*

In *State v. Blackstock*, 165 N.C.App. 50, 598 S.E.2d 412 (2004), Weeks was shot while working at a convenience store he owned and operated. He died five days later, but before his death, and while he was in the hospital, Weeks made several statements to his wife and daughter. The trial court allowed these statements over the defendant's objection. The Court of Appeals of North Carolina concluded "the statements made by Weeks to his wife and daughter were essentially nontestimonial in nature." *Id.* at 420. The statements were "personal conversations that took place over a series of several days, made at a time when Weeks' physical condition was improving." *Id.* Thus, the court found it unlikely that Weeks made the statements under the reasonable belief that they would be used prosecutorially.

*Woods v. State*, 152 S.W.3d 105 (Tex.Crim.App.2004), found incriminating statements made by a co-defendant to acquaintances at a coffee shop were nontestimonial. The statements

were "casual remarks ... made to acquaintances." *Id.* at 114 (footnote omitted).

In *State v. Orndorff*, 122 Wash.App. 781, 95 P.3d 406 (2004), two masked men forced their way into Nordby's house. Nordby, who was upstairs at the time with Lorina Coble and several others, heard his minor son screaming and went downstairs to investigate. Nordby engaged in a struggle with the two men, both of whom were armed. The intruders eventually subdued Nordby, but they fled after a 911 dispatch operator returned Coble's call which had been aborted. Coble did not testify at trial, but the trial court allowed Nordby to testify that "Coble told him she saw a man with a pistol downstairs, saw both men leave, she tried to call 911, and was panic-stricken." *Id.* at 408. The court found Coble's statement nontestimonial: "It was not a declaration or affirmation made to establish or prove some fact; it was not prior testimony or a statement given in response to police questioning; and Coble had no reason to expect that her statement would be used prosecutorially." *Id.*

### 4. Application to the Case *Sub Judice*

■ Hill's statements to Hicks were nontestimonial. First, the utterances do not fit within those examples that *Crawford* says clearly are testimonial—*i.e.*, they were not testimony at a preliminary hearing, before a grand jury, or at a former trial; or statements made to police during an investigation. *See Crawford*, 541 U.S. at 68–69, 124 S.Ct. at 1374.

Next, we turn to the trilogy of formulations mentioned by the *Crawford* opinion. *Id.* at 51–52, 124 S.Ct. at 1364. We need not adopt any of the three formulations because, in this case, the hearsay declarations are nontestimonial under each test. Hill's statements were not *ex parte* in-court testimony or its functional equivalent, and they were not extrajudicial statements contained in formalized materials; to the contrary, Hill's remarks were totally devoid of any formality or governmental involvement. As to the third formulation, we find no evidence that a reasonable speaker in Hill's position would believe the statements made would be available for use at a later trial. Hill's statements were made to warn an acquaintance not to purchase a gun that had just been used in a murder. Furthermore, the statements could incriminate Hill.

Therefore, we are unconvinced that Hill, or a person in his position, would have uttered the statements with the reasonable belief they later would be used prosecutorially.

Hill's declarations are much more akin to casual remarks to an acquaintance than formal statements to government officers. *See Crawford* at 51–52, 124 S.Ct. at 1364 (observing an "accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Moreover, they bear no resemblance to the sort of examinations by justices of the peace which the *Crawford* Court stressed were the real impetus behind the Confrontation Clause. We hold that Hill's statements to Hicks were nontestimonial; therefore, *Crawford* does not mandate that Davis be afforded the opportunity to test Hill's statement through cross-examination.

However, our analysis does not end here. Under *Crawford*, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." 541 U.S. at 68, 124 S.Ct. at 1374. Accordingly, we turn to analyze whether Hill's hearsay statements fall under a firmly rooted hearsay exception or else bear particularized guarantees of trustworthiness. *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531.

## C. Reliability Under Ohio v. Roberts
### 1. The Rule Against Hearsay

" 'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. Hearsay statements are not admissible unless otherwise provided by the South Carolina Rules of Evidence or by other rules prescribed by the South Carolina Supreme Court or by statute. Rule 802, SCRE.

The trial judge admitted Hill's declarations as statements made in furtherance of a conspiracy, *see* Rule 801(d)(2)(E), SCRE, and ruled that the utterances were not admissible as present sense impressions. Neither Hill nor Davis was charged with conspiracy and no evidence of a conspiracy

exists. On appeal, the State concedes that admitting the declarations as statements by a coconspirator was erroneous. However, the State argues that admission of the statements should be upheld under the excited utterance exception found in Rule 803(2), SCRE. We address this exception pursuant to Rule 220(C), SCACR ("The appellate court may affirm any ruling, order, or judgment upon any ground(s) appearing in the Record on Appeal."). *See also I'On, L.L.C. v. Town of Mount Pleasant,* 338 S.C. 406, 526 S.E.2d 716 (2000).

## 2. Excited Utterance Exception

Pursuant to Rule 803(2), a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule, regardless whether the declarant is available as a witness. Rule 803(2), SCRE; *see also State v. Sims,* 348 S.C. 16, 20, 558 S.E.2d 518, 520 (2002) ("An excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.").

Both the United States Supreme Court and the South Carolina Supreme Court have declared that excited utterance is a firmly rooted hearsay exception. *White v. Illinios,* 502 U.S. 346, 355 n. 8, 112 S.Ct. 736, 116 L.Ed.2d 848 ("There can be no doubt that the two exceptions we consider in this case are 'firmly rooted.' The exception for spontaneous declarations is at least two centuries old.... It is currently recognized under Federal Rule of Evidence 803(2), and in nearly four-fifths of the States."); *State v. Burdette,* 335 S.C. 34, 45, 515 S.E.2d 525, 531 (1999) ("We ... find that the excited utterance exception is firmly rooted in South Carolina law and satisfies the requirements of the Confrontation Clause."); *accord State v. Dennis* 337 S.C. 275, 523 S.E.2d 173 (1999). Accordingly, we must determine whether Hill's statements qualify under the excited utterance exception to the hearsay rule. If so, they were properly admitted.

Three elements must be met to show a statement is an excited utterance: (1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of the excite-

ment; and (3) the stress must have been caused by the startling event or condition. *Sims,* 348 S.C. at 21, 558 S.E.2d at 521. The court must consider the totality of the circumstances in determining whether a statement falls within the excited utterance exception. *State v. LaCoste,* 347 S.C. 153, 160, 553 S.E.2d 464, 468 (Ct.App.2001); *State v. McHoney,* 344 S.C. 85, 544 S.E.2d 30 (2001). "The rationale behind the excited utterance exception is that the startling event suspends the declarant's process of reflective thought, reducing the likelihood of fabrication." *LaCoste* at 160, 553 S.E.2d at 468 (quoting *State v. Dennis,* 337 S.C. 275, 284, 523 S.E.2d 173, 177 (1999)).

Time is a factor in the excited utterance analysis, and our courts have allowed intervals in excess of an hour, even up to eleven hours, between the startling event and the statement. *See State v. Blackburn,* 271 S.C. 324, 328, 247 S.E.2d 334, 336 (1978). Courts have disallowed use of the excited utterance exception when an unusually long time period passed before the statement was made and the declarant had time to compose himself or herself or had other opportunities to speak. *See State v. Whisonant,* 335 S.C. 148, 515 S.E.2d 768 (Ct.App.1999) (rejecting use of the exception based on ten-hour interval and two intervening opportunities to speak in which the declarant said nothing); *Burroughs,* 328 S.C. at 500–01, 492 S.E.2d at 413–14 (finding no excited utterance when there was a ten-hour interval and the declarant said she used the time to compose herself). The *Burroughs* court noted a useful rule of thumb that when enough time has elapsed between the event and the statement to permit reflective thought, the statement should be excluded. *Id.* at 500, 492 S.E.2d at 413. Use of the exception has been overturned when the interval cannot be determined from the record. *State v. Garcia,* 334 S.C. 71, 77, 512 S.E.2d 507, 510 (1999); *State v. Hill,* 331 S.C. 94, 501 S.E.2d 122 (1998).

However, the stress of the event—not the time between the event and the statement—is the linchpin of the excited utterance exception. *See State v. Quillien,* 263 S.C. 87, 97, 207 S.E.2d 814, 817 (1974). "There are no hard and fast rules as to when *res gestae* ends." *State v. Harrison,* 298 S.C. 333, 336, 380 S.E.2d 818, 820 (1989), *superseded by rule*

*as stated in Hill,* 331 S.C. at 99, 501 S.E.2d at 125.[1] Time is one factor to consider; "[o]ther factors useful in determining whether a statement qualifies as an excited utterance include the declarant's demeanor, the declarant's age, and the severity of the startling event." *Sims,* 348 S.C. at 22, 558 S.E.2d at 521.

Additionally, the statement must be based on first-hand information, such as statements of an actual witness to an event. *Hill,* 331 S.C. at 99, 501 S.E.2d at 125; *LaCoste,* 347 S.C. at 161, 553 S.E.2d at 468. Firsthand knowledge may be established by information conveyed in the statement itself. *Id.* at 161, 553 S.E.2d at 469.

### 3. Application of Excited Utterance Exception to Hill's Statement

Hill's statement that the shotgun was used to kill Davis relates to a murder, and murder is certainly a startling event. *See State v. Dennis,* 337 S.C. 275, 284, 523 S.E.2d 173, 177 (1999) (rejecting appellant's argument that the State failed to show a statement was an excited utterance where declarant had just seen his brother shoot an unarmed man, abruptly ending a fistfight). The closer issue is whether Hill was under the stress of the startling event when he made the controverted statements.

Considering the factors of severity of the stress of the event, time between the event and the utterance, and surrounding indicia of stress, we find sufficient evidence that Hill was under the stress of the murder when he made the declarations to Hicks. The statements relate to a highly stressful event. The time between the event and the statements was well within the time frame courts have allowed for excited utterances. *See, e.g., Burdette,* 335 S.C. 34, 515 S.E.2d 525 (allowing statements made less than one hour after event). Here, Hill encountered Hicks just ten to thirty minutes after

---

1. Although *Harrison; Blackburn,* and *Quillien* predate the South Carolina Rule of Evidence, their reasoning is still efficacious. Those cases were decided under the *res gestae* doctrine, and Rules 803(1) & (2) codify *res gestae. See State v. Burdette,* 335 S.C. 34, 43, 515 S.E.2d 525, 530 (1999); *State v. Burroughs,* 328 S.C. 489, 498–99, 492 S.E.2d 408, 412–14 (Ct.App.1997).

Stevens and the two unidentified individuals fled from the murder scene. Furthermore, surrounding circumstances point to a conclusion that the stress of the event had not abated. Both Davis and Stevens bought an unusually large amount of drugs; Davis was willing to exchange an entire bag full of coins for drugs without counting it; and Stevens gave away drugs in an unusually generous gesture.

Furthermore, we find the record strongly supports Hill's statements were based on firsthand information. *Hill* established that "[s]tatements which are not based on firsthand information, as where the declarant was not an actual witness to the event, are not admissible under the exited utterance . . . exception to the hearsay rule." 331 S.C. at 99, 501 S.E.2d at 125 (citing 23 C.J.S. *Crim. Law* § 876 (1989)). In *Hill*, the defendant shot a police officer in a car wash parking lot. Kenneth Grant arrived at the car wash fifteen minutes after the shooting, and testified *in camera* that some fifteen to twenty minutes after arriving he heard an unidentifiable person in the crowd say there were two suspects. The supreme court agreed with the trial court that the hearsay was inadmissible. Among other reasons for the ruling, there was "no evidence the unidentified declarant witnessed the shooting." *Id.* at 100, 501 S.E.2d at 125. Subsequently, *LaCoste* amplified *Hill* by holding that firsthand knowledge of unknown declarants may be established by the declaration itself. 347 S.C. at 161, 553 S.E.2d at 469.

Here, there is sufficient evidence that Hill's declarations to Hicks were based on personal knowledge. Unlike *State v. Hill*, the declarant in this case was known. Immediately before the shooting, Steven and Davis were heard arguing with the victim. Just after the shooting three individuals, one of whom was Stevens, were seen fleeing the scene. Minutes later Hill appeared with Stevens and Davis. We find this evidence supports the inference that Hill was one of the three individuals fleeing the scene; that he was, therefore, present at the murder scene; and that he had firsthand knowledge that the shotgun had been used to kill Williams.

Bolstering this conclusion is a "jailhouse confession," signed by Davis, indicating that Davis shot the victim. When Davis was arrested, he was jailed and placed in a cell directly across

from Hicks, who was incarcerated on an unrelated offense. According to Hicks, he and Davis would communicate with each other by placing a letter in a book and sliding the book from cell to cell. Hicks stated that he slid the following letter, which was admitted into evidence, to Davis:

> Hey Chris the night that ya'll came and tried to sell me the shotgun was ya'll coming from Paul's house then what I need to know from you who was the trigger man and I know it wasn't Greg from what he told me that night so it had to be [illegible] you or Reggie cause you had the gun and Greg told me you and Reggie the who [sic] went in the house so who pulled the trigger if Reggie did it just write Reggie's name or if you did just sign your name at the bottom and I will help you out by writing that letter just write what you want me to tell them.

The letter is signed "Christopher Davis" and dated "3–15–01." A handwriting expert testified that the signature was Davis's. Hicks acknowledged that he observed Davis sign the letter, and Davis admitting signing a piece of paper for Hicks, although he contended it was blank when he signed it. Davis does not appeal the trial judge's admission of this confession. Therefore, its stands on its own and was independent evidence for the jury's consideration. The confession indicates that Hicks knew from Hill that either Stevens or Davis shot the victim. Thus, the confession, coupled with the strong inference that Hill was present at the crime scene, constitutes sufficient evidence that Hill had personal knowledge of the contents of his declarations.

Based on the totality of the circumstance, we find the record supports (1) Hill's statement was related to a startling event; (2) it was made while Hill was under the stress of the event; (3) the stress resulted from the startling event; and (4) the statement was based on firsthand information. We therefore find Hill's statement admissible under Rule 803(2), a firmly rooted hearsay exception.

## II. Harmless Error

Finally, the State contends any error in admission of Hill's hearsay declarations would be harmless. We agree.

■ "A violation of the defendant's Sixth Amendment right to confront the witness is not *per se* reversible error if the error was harmless beyond a reasonable doubt." *State v. Gillian,* 360 S.C. 433, 454, 602 S.E.2d 62, 73 (Ct.App.2004) (internal quotation marks omitted) (quoting *State v. Mizzell,* 349 S.C. 326, 333, 563 S.E.2d 315, 318 (2002)); *see also Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (finding Confrontation Clause violations are subject to harmless error analysis); *Bockting v. Bayer,* 399 F.3d 1010, 2005 WL 406284 *8 (9th Cir.2005) ("Confrontation Clause violations are subject to harmless error analysis and thus may be excused depending on the state of the evidence at trial."); *United States v. Nielsen,* 371 F.3d 574, 581 (9th Cir.2004) ("Confrontation Clause violations are subject to harmless error analysis, because the Constitution entitles a criminal defendant to a fair trial, not a perfect one.") (internal quotation marks and citation omitted); *Smith v. State,* 898 So.2d 907, 2004 WL 921748 (Ala.Crim.App.2004) (noting Confrontation Clause violations are subject to harmless error analysis); *State v. Cotto,* 182 N.J. 316, 865 A.2d 660 (2005) (holding statements which did not fall under excited utterance exception were erroneously admitted but that the error was harmless); *State v. Graham,* 314 S.C. 383, 386, 444 S.E.2d 525, 527 (1994) ("A violation of the defendant's Sixth Amendment right to confront the witness is not *per se* reversible error. This Court must determine whether the error was harmless beyond a reasonable doubt.") (internal quotation marks and citation omitted); *State v. Portnoy,* 43 Wash.App. 455, 718 P.2d 805 (1986) (finding Confrontation Clause violations are subject to harmless error analysis); *cf. Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (noting the erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination, and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment are both subject to harmless error analysis).

Courts around the nation have found that *Crawford* violations are no exception to this rule. *United States v. Rodriguez–Marrero,* 390 F.3d 1 (1st Cir.2004) (finding signed confession testimonial under *Crawford* and engaging in a *sua sponte* harmless error analysis, but concluding admission of

the statements was not harmless); *United States v. McClain,* 377 F.3d 219 (2nd Cir.2004) ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review ... and *Crawford* does not suggest otherwise.") (citations omitted); *United States v. Rashid,* 383 F.3d 769 (8th Cir.2004) (noting statements taken by FBI agent during course of interrogation were testimonial for purposes of *Crawford,* but admission was harmless error because other evidence of guilt was overwhelming); *Stancil v. United States,* 866 A.2d 799, 813–14, 2005 WL 195547 at *13 (D.C.App.2005) (observing that the harmless error analysis applies to *Crawford* violations but finding the government had not made a sufficient showing the error was harmless); *People v. Song,* 124 Cal.App.4th 973, 22 Cal.Rptr.3d 118 (2004) (employing harmless error analysis to *Crawford* violation and finding admission of the testimonial evidence was not harmless error); *People v. Edwards,* 101 P.3d 1118 (Colo.App.2004) ("[V]iolations of the rule announced in *Crawford* constitute errors in the trial process and are subject to either plain or harmless error review."); *Bell v. State,* 278 Ga. 69, 597 S.E.2d 350 (2004) (finding statements victim made to police officer were testimonial and inadmissible under *Crawford,* but that the error was harmless); *People v. Patterson,* 347 Ill.App.3d 1044, 283 Ill.Dec. 871, 808 N.E.2d 1159 (2004) (applying harmless error analysis to alleged *Crawford* violation); *Hammon v. State,* 809 N.E.2d 945 (Ind.App. 2004) (opining that even if battery affidavit were testimonial and improperly admitted, any error was harmless because its content was cumulative of other evidence); *State v. Wright,* 686 N.W.2d 295 (Minn.App.2004) (declining to rule whether a 911 call was testimonial because even if it were, admission of the call would constitute harmless error).

 Whether an error is harmless depends on the circumstances of the particular case. *In re Harvey,* 355 S.C. 53, 584 S.E.2d 893 (2003); *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998); *State v. Thompson,* 352 S.C. 552, 575 S.E.2d 77 (Ct.App.2003). No definite rule of law governs this finding. *State v. Pagan,* 357 S.C. 132, 591 S.E.2d 646 (Ct.App. 2004). Rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. *State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985).

■■■■■ Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey,* 355 S.C. at 63, 584 S.E.2d at 897; *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151; *State v. Burton,* 326 S.C. 605, 486 S.E.2d 762 (Ct.App. 1997). Where a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed. *State v. Pickens,* 320 S.C. 528, 466 S.E.2d 364 (1996); *Thompson,* 352 S.C. at 562, 575 S.E.2d at 83; *State v. King,* 349 S.C. 142, 561 S.E.2d 640 (Ct.App.2002). Error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained. *Arnold v. State,* 309 S.C. 157, 420 S.E.2d 834 (1992).

■■■■ Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard,* 303 S.C. 172, 399 S.E.2d 595 (1991); *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989); *Adams,* 354 S.C. at 381, 580 S.E.2d at 795; *see also State v. Kelley,* 319 S.C. 173, 460 S.E.2d 368 (1995) (noting that when guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside the conviction for insubstantial errors not affecting result).

■■■■ The admission of improper evidence is harmless where the evidence is merely cumulative to other evidence. *State v. Haselden,* 353 S.C. 190, 577 S.E.2d 445 (2003); *State v. Braxton,* 343 S.C. 629, 541 S.E.2d 833 (2001); *State v. Blackburn,* 271 S.C. 324, 247 S.E.2d 334 (1978); *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999); *see also State v. Williams,* 321 S.C. 455, 469 S.E.2d 49 (1996) (instructing that error in admission of evidence is harmless where it is cumulative to other evidence which was properly admitted); *State v. Schumpert,* 312 S.C. 502, 435 S.E.2d 859 (1993) (explicating that any error in admission of evidence cumulative to other unobjected-to evidence is harmless).

Hill's statements, as related by Hicks, were (1) Davis and Stevens went into the victim's house, and (2) the shotgun that

Davis was trying to sell was used to murder the victim. Considering the other evidence before the jury, we harbor no reasonable doubts that any error in admitting Hill's statement would have been harmless.

Foremost, Davis's confession, the admission of which is not at issue, contains the substance of Hill's statements as testified to by Hicks. The confession establishes that Hicks knew "from what Greg [Hill] told me that night ... [the trigger man] had to be ... you or Reggie [Stevens] cause you had the gun and Greg told me you and Reggie the who [sic] went in the house...." Thus, the substance of Hill's declarations were properly before the jury. Consequently, Hicks's testimony as to Hill's hearsay was merely cumulative of other evidence, and its admission—even if erroneous—was harmless.

Additionally, two witnesses, Hicks and his brother, Raymond, heard Davis, Stevens, and the victim arguing just before the gunshot. Following the gunshot, Hicks, Raymond, and a third witness, Calvin Patten, observed three individuals running from the victim's back yard. Hicks and Patten both identified Stevens as one of the fleeing men, and police matched Stevens's shoe print with one found at the crime scene.

Between ten and thirty minutes after the gunshot, Hill, Stevens, and Davis were seen together. According to Hicks, Davis had the shotgun, and Stevens purchased over $100 worth of crack cocaine, an unusually large purchase for Stevens. Calvin Patten testified that Stevens gave him some drugs in an uncharacteristically generous gesture. Lorenzo White averred that late one night Davis came to his house with the shotgun, wiped it down with Clorox to remove finger prints, and hid the gun somewhere in White's house.

Thus, excluding Hicks's testimony regarding Hill's hearsay statements, the jury heard evidence that several witnesses overheard Stevens, Davis, and Williams arguing; thereafter a gun was fired; Stevens and two other individuals were seen fleeing the crime scene; Stevens's footprint was found at the crime scene; Stevens and Hill emerged and made a large drug purchase; Stevens gave away some crack cocaine in an unusually generous gesture; minutes later, Stevens and Hill returned with Davis, who was trying to sell a shotgun; Davis took the shotgun to a friends house, where he wiped down the

gun with Clorox and hid it; Hicks wrote that he knew Davis and Stevens entered the house, and that one of them shot the victim; and Davis confessed to the murder. Under these facts, even were we to conclude Hill's statements were improperly admitted, they were cumulative of statements in the confession, and the other evidence against Davis was so substantial that the hearsay utterances were neither material nor prejudicial. Therefore, any error in admitting the statements would be harmless.

## CONCLUSION

Hill's hearsay statements to Hicks were properly admitted. The utterances were nontestimonial; therefore, *Crawford v. Washington* does not bar the admission of these statements, even though Hill was unavailable at trial and Davis did not have a prior opportunity to cross-examine him. Hill's statements were admissible under the excited utterance exception, Rule 803(2), SCRE, which is recognized as a firmly rooted hearsay exception. Accordingly, the Confrontation Clause does not require that Davis have the opportunity to cross-examine Hill regarding the nontestimonial excited utterance. Regardless, any error in admitting the statements would have been harmless. Davis's convictions are

**AFFIRMED.**

BEATTY and SHORT, JJ., concur.